Robert K. NELLIS, Plaintiff,

v.

SERVICE WEB OFFSET
CORP., Defendant.

No. 87 C 5473.

United States District Court,
N.D. Illinois, E.D.

Sept. 15, 1988.

Russell J. Fee, Oak Park, Ill., for plaintiff.

Timothy L. Moorehead, McDermott, Will & Emery, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Robert Nellis ("Nellis") has sued his ex-employer Service Web Offset Corp. ("Service Web"), asserting a violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. Service Web has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, the motion is granted and this action is dismissed.

### Facts[1]

In July 1977 Service Web, which is engaged in the commercial printing business, hired Nellis (then aged 54) as a production operator (Nellis Dep. 5–6). That job required Nellis to oversee the entire production process of printing jobs assigned to him (*id.* 24). At that time Nellis' supervisor was the head of the production department, David Liberty ("Liberty") (*id.* 52).

Production operators work closely with the salespeople who give them job orders. For that purpose Liberty would assign specific salespeople to work with particular production operators (*id.* 58–60). Nellis soon encountered problems when salespeople Erwin Lukas and Kate McCarty, then assigned to him, complained to Service Web President Donald Borzak ("Borzak") that Nellis was not responsive when they needed decisions made and that Nellis was unable to provide answers to questions about the progress of projects. Later all the other salespeople assigned to Nellis expressed dissatisfaction with his performance (Borzak Dep. 46).

Unfortunately, Nellis' performance problems were not limited to his relationship with salespeople:

1. Borzak also complained to him about his judgment (Nellis Dep. 71–72).

2. Nellis apparently had problems handling complicated multi-piece jobs and conceptualizing layouts for such jobs (*id.* 166–67, 193).

3. Shipping department employees complained about having to make decisions Nellis should have made (*id.* 198–99).

4. Finally, Liberty received complaints from the foremen of all four plant departments, expressing their frustrations at not being able to read Nellis' instructions and at not receiving answers to their questions (Liberty Dep. 74–87). Liberty eventually discussed those complaints with Nellis (Liberty Dep. at 87–89).

Liberty also conducted annual oral performance evaluations of Nellis. During those reviews Liberty criticized Nellis for lacking aggressiveness (Nellis Dep. 199–200).

Service Web's Executive Committee comprised Borzak, Secretary–Treasurer and part-owner Alan Mitchell ("Mitchell"), Chief Operating Officer Joan Vanderbeck and department heads Carl Bruno, Robert Saluga ("Saluga") and Liberty. They frequently discussed Nellis' performance as a production operator. They saw no improvement on Nellis' part and, as Service Web's sales volume began to increase during the period from 1977 to 1983, Nellis' deficiencies became more troubling for the company (Liberty Dep. 89, 98; Borzak Dep. 18, 51).

In December 1983 Nellis was transferred to the position of estimator (Nellis Dep. 54–55, 74–75). It was the Executive Committee's consensus that moving him to estimator might relieve him of some of the pressures of his job (Borzak Dep. 53). Furthermore, Saluga—head of the estimating department and Nellis' new supervisor—was overworked, and it was hoped that Nellis could help him (Saluga Dep. 49–50).

---

1. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Nellis (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)).

**400**

Nellis had extensive experience and training as an estimator. He had been trained in that line of work at the Printing Industry of Illinois, where he received a degree (Nellis Dep. 11–14). Before working at Service Web, Nellis had been an estimator at Riley Printing Company from 1973 to 1977 (Nellis Dep. 30–32). Indeed, before that Nellis had been an estimator for over 15 years at Segerdahl Printing Company, performing work similar to the estimating Nellis did at Service Web (Nellis Dep. 37–39). Nellis considered himself qualified for the Service Web estimator position (Nellis Dep. 77).

Nevertheless Nellis continued to have performance problems. Saluga delayed Nellis' first oral review from July 1984 until September 1984 because he was perplexed at why Nellis could not "catch on" to the job. Saluga then told Nellis (1) he should be doing better, (2) Saluga was unhappy with Nellis' performance and (3) Nellis' prior experience should make performance easy. Saluga asked Nellis if he had any ideas on how to improve his performance, but Nellis had none (Nellis Dep. 79–80; Nellis Dep. Ex. 2; Saluga Dep. 85–89).

Nellis' difficulties forced Saluga to check each quotation prepared by Nellis every day (Saluga Dep. 54–55). In many cases either Saluga or estimator Carl Johnson would prepare the job layouts for Nellis (id. 114–18). Salespeople would not go directly to Nellis for estimates unless they were assigned to him by Saluga, because they had lost confidence in him (id. 81–82).

In 1985, frustrated over Nellis' inability to perform his job as estimator adequately, Service Web created a new position specifically for Nellis. His new title was biller/estimator and, in conjunction with the change, he was moved near the accounting department and controller Seymour Lempert. Although the job was similar to Nellis' prior one, billing now became his primary responsibility. As a biller Nellis compared actual costs with estimated costs and

provided information to accounting personnel, who then prepared computer invoices. Saluga remained Nellis' supervisor (Nellis Dep. 88–90, 92; Saluga Dep. 151).

Nellis encountered difficulties in that job as well. He was unable to give accurate treatment to even 30% of the billing assigned to him (Saluga Dep. 138, 144). Nellis sought help on a number of assignments (id. 155). His inability to perform adequately was illustrated by his handling of the B & B account, one of Service Web's major customers. Even after Borzak repeatedly showed him how to do the work, Nellis could not grasp the assignment. Borzak expressed his exasperation over Nellis' failure to understand. Finally Borzak lost all confidence in Nellis' ability to do the job and assigned the B & B billing to a production operator (Borzak Dep. 67–72; Saluga Dep. 136, 141).

Service Web's 1985 sales volume declined approximately $2 million from the preceding year. Service Web faced increasing pressure from an industry-wide slump (Borzak Dep. 20–21). Owners Borzak and Mitchell took a salary cut, six or seven bargaining unit employees were released from the bindery (Borzak Dep. 23–24), and the Executive Committee discussed other ways to make cuts, evaluating dispensable job functions and employees (id. 26–29). On November 20, 1985 the Executive Committee decided to reduce one employee from production and one from estimating (Saluga Dep. 160–61):

1. Darlene Williams' position as a production operator was abolished, and she (a 28–year–old) was offered a demotion to an open position as a switchboard operator.

2. Nellis' position of biller/estimator was also abolished (Saluga Dep. 163–66; Borzak Dep. 42).

Two other employees, Mary Acker and Susan Engles, were either promoted or transferred when their positions were eliminated (D.Int.Ans. 10).[2]

<hr/>

2. Nellis' memorandum labels the latter two as "younger employees," but the record does not identify their ages. Although Service Web does not dispute Nellis' characterization, such unsup-

ported assertions do not meet the Rule 56(e) requirement of admissible evidence. As it happens, it makes no difference whether those two

After the decision to terminate Nellis had been made, he suffered a heart attack in December 1985. Service Web paid Nellis his full salary while he recovered, and Nellis was not terminated until June 1986 (Saluga Dep. 182, 194–96; Borzak Dep. 79). He was then 63 years old.

### ADEA's Principles

From ADEA's very nature, the ultimate burden of a terminated employee in the protected age group (40 to 70 years old) "is to prove that he was discharged because of his age" (*Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988)).[3] That does not call for proof "that age was the sole factor motivating the employer's decision, only that age was a determining factor in the sense that he would not have been fired but for the employer's motive to discriminate on the basis of age" (*id.*).

Where (as here) a plaintiff offers no direct or circumstantial evidence that age was a determining factor in the discharge, he or she must turn to the indirect, burden-of-production-shifting method of proof originally established for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), and later adapted to ADEA claims (*Ayala v. Mayfair Molded Products Corp.*, 831 F.2d 1314, 1318 (7th Cir.1987).[4] Application of that ping-pong approach to reduction-in-force ("RIF") cases has proved troubling (*Oxman*, 846 F.2d at 453 (citation omitted)):

> Unlike the typical discharge case, an employer who terminates employees pursuant to a RIF rarely replaces the employees it let go.... An employee challenging his treatment in a RIF case, therefore, cannot satisfy the fourth element of the *McDonnell Douglas* prima facie proof formulation for non-RIF discharge

cases—that the employer sought a replacement for him. This creates a problem, because the first three elements of the prima facie proof formulation cannot, standing alone, create a presumption of discrimination.

After a false start in that respect (*Matthews v. Allis–Chalmers*, 769 F.2d 1215, 1217 (7th Cir.1985) (per curiam)), our Court of Appeals has recently established a new test for RIF cases in *Oxman* (specifically overruling *Matthews* ). Now the prima facie case for the plaintiff in such a case requires a showing that (*Oxman*, 846 F.2d at 455):

1. He was within the protected age group.

2. He was performing according to his employer's legitimate expectations.

3. He was terminated.

4. Others not in the protected class were treated more favorably.

Steps 2 and 3 of the original *McDonnell Douglas* framework—the post-prima-facie-case shifting of the burden to the employer to produce a legitimate, nondiscriminatory reason, followed by the return of the burden to the employee to offer proof that such reason is pretextual—remain unchanged by *Oxman*. And of course the teaching of *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) is that the burden of *persuasion* of intentional discrimination always remains on the employee.

### Application to Nellis

■■■ As already indicated, Nellis' reliance on the indirect, burden-shifting method of proof requires that he establish a prima facie case as his first step. Service

---

**3.** This opinion will refer to what an ADEA plaintiff must prove, because that is the form in which the controlling cases address the requirements. It should, however, be emphasized that in the present context—involving opposition to a summary judgment motion—all Nellis must do is to advance evidence that (with reasonable inferences in his favor) creates a material factual issue, rather than to prove his case by a preponderance of the evidence.

**4.** Both because the *McDonnell Douglas* formulation is so familiar by now and because (as the following text discussion reflects) it has had to be restructured for cases like this one, it will not be repeated here in its initial form.

Web offers a twofold response to his efforts in that respect:

1. It says Nellis has not established a prima facie case even in the lower-threshold sense applicable to a Rule 56 motion.

2. Even were that not so, there is no evidence that reasonably suggests Service Web's articulated, nondiscriminatory reasons for terminating Nellis were pretextual.

As this Court has observed in such cases as *Stratton v. Handy Button Machine Co.*, 639 F.Supp. 425, 430–31 (N.D.Ill.1986), an employee's prima facie component of demonstrating that he was performing according to the employer's "legitimate expectations" could be read broadly enough to telescope the entire analysis (and, in this case, both phases of Service Web's response) into a one-step *McDonnell Douglas* (or *Oxman*) inquiry. That possibility is well illustrated here.

Thus on the prima-facie-case approach, there is no question that Nellis was within the protected age group (the first *Oxman* factor) and that he was terminated (the third factor). And from a perspective most favorable to Nellis, it appears a reasonable inference that at least one employee not in the protected class was treated more favorably (the fourth factor): When Darlene Williams' position as a production operator was also abolished as part of the RIF, she was offered a demotion to an open position as a switchboard operator—an option not made available to Nellis.

It is thus the third *Oxman* factor—performance according to the employer's legitimate expectations—on which Nellis' prima facie case must hinge. And by definition those defeated expectations are the very factors that constitute Service Web's articulated, nondiscriminatory reasons for firing Nellis. As suggested a bit earlier, the same considerations thus apply at both levels of the *McDonnell Douglas* analysis—steps 1 and 3.

There is no need to rehearse the extensive areas of dissatisfaction with Nellis' performance already detailed in the "Facts" section of this opinion. Suffice it to say that during his tenure with Service Web, Nellis had worked in three positions with decreasing levels of responsibility and difficulty. Yet Nellis proved unable to have performed any of the three jobs adequately, even though on paper he was highly qualified by experience and education for all three.

Given that focus of the controversy, Nellis understandably blends the first and third steps of the *McDonnell Douglas* framework. This opinion will simply review his contentions without attempting to label them as going to the legitimate-expectations component of the prima facie case or, instead, to the pretextual nature of Service Web's statement of its reasons for firing Nellis: its defeated expectations.

First Nellis contends Service Web has established and followed step-by-step procedures in cases of performance problems, but it did not follow those procedures with Nellis.[5] If true, that might perhaps give rise to an inference of pretext. But the contention is unsupported by evidence. All that is offered is an isolated instance in which Service Web did send one employee to a psychologist for counseling before she was terminated (Liberty Dep. 50–51). Nothing suggests any "established procedures" for dealing with problems, as contrasted with informal handling of individual employee problems on an ad hoc basis. And nothing is offered to suggest any disparate treatment of Nellis (that is, different handling under like circumstances)—indeed, Service Web explains without contradiction that the one instance of counseling was directed to the employee's job attitude, concededly not among Nellis' many problems.

Nellis next argues that his substandard work performances were to be expected, given the disorganized environment in which he was required to function. In essence, he does not challenge Service Web's characterization of his performance,

---

5. Specifically, Nellis Mem. 19 asserts Service Web employed a combination of "formal" and "informal" meetings with supervisors, coupled with employment counseling by Judy Smith (a Service Web employee) or a hired psychologist or both.

instead attacking Service Web for what he views as an unproductive work environment. But Nellis' opinions about Service Web's efficiency and organization are irrelevant. Even if he were right (a matter on which this Court need not express an opinion), it would remain true that "ADEA is about age discrimination, not shabby or numbskull employment practices" (*Zick v. Verson Allsteel Press Co.*, 644 F.Supp. 906, 913 (N.D.Ill.1986), *aff'd mem.*, 819 F.2d 1143 (7th Cir.1987)). This nonissue adds nothing to the analysis of whether Service Web engaged in disparate treatment because of Nellis' age.

Nellis' third contention is that Service Web imposed unreasonable expectations as to his performance as an estimator and biller/estimator. Here the short answer is that Nellis was eminently qualified both by experience and education for both jobs. Indeed, Nellis concedes that he considered himself qualified to be an estimator (Nellis Dep. 77) and that he was not discriminated against during his tenure in that job (*id.* 107–08). Accordingly his third argument is without merit.[6]

Nellis also says Service Web did not inform Nellis what was expected of him. Not true. Borzak, Liberty and Saluga all expressed dissatisfaction with Nellis. Nothing in the record supports the notion that Nellis was unaware of Service Web's expectations.

It must then be concluded that Nellis has not met his burden of showing a genuine issue of material fact on the issue of Service Web's legitimate perceptions of his inadequate performance. And it matters not whether that issue is perceived as a step 1 (prima facie case) or step 3 (absence of pretext) failure on his part in *McDonnell Douglas–Oxman* terms. Out of an abundance of caution, however, another issue that clearly relates only to the second and third steps of the *McDonnell Douglas* framework will also be examined.

Service Web has articulated a legitimate, nondiscriminatory reason for Nellis' discharge: its economically motivated RIF. Here too Nellis has not met his burden of creating a material factual issue as to pretext.

On that score Nellis Mem. 23 says Service Web was not in any real financial difficulty. He points to its $2,555,000 capital expenditure program and its increased depreciation expense of $393,372 (which assertedly depressed its earnings artificially) to argue that Service Web's decrease in sales volume is illusory. At best his argument is a non sequitur; at worst it is an unreasonable (and impermissible) effort to substitute his business judgment for his employer's. Depreciation is of course a legitimate expense of doing business, one directly related to the anticipated need for capital-asset replacement. And in the latter respect Saluga testified (Dep. 19) that companies in the commercial printing business must rebuild their equipment every seven years "to keep current or else you're out of business."

Nellis prefers to ignore the fact that six or seven bindery employees were terminated, while at the same time owners Borzak and Mitchell took a pay cut (Borzak Dep. 23–24). Those steps were viewed by Service Web as forced by the marked decline in its net sales and net income. Nellis Mem.Ex. O confirms that:

| | Net Sales | Net Income |
|---|---|---|
| 1984 | $19,610,365 | $261,946 |
| 1985 | 18,466,233 | 51,773 |
| 1986 | 17,526,707 | 41,628 |

Again nothing supports Nellis' contention of any fabricated disguise for age discrimination.

In sum, Nellis has once more failed to create a genuine issue of material fact on the pretext question. His attempt to manipulate the numbers cannot alter the conclusion that Service Web responded to a

---

6. In this area Nellis Mem. 21 places the blame for his problems on Saluga, asserting Saluga could not delegate work and was an oppressive manager. In a sense that is a variant of Nellis' second argument and thus irrelevant. But even in substantive terms, Nellis glosses over the fact that two other employees working under Saluga—Garth Guido and Kevin Smith—were able to perform their jobs adequately. It is simply not reasonable to infer that Saluga and not Nellis himself was to blame for Nellis' poor performance.

decline in net sales and income with an economically motivated RIF.[7]

This case is all too typical of the phenomenon sometimes encountered in employment discrimination cases: Someone who is within a protected group (whether age, race, sex, national origin or something else) believes that an adverse employment decision has been made *because* of that factor, when all the objective evidence shows the action stemmed instead from the employer's legitimate dissatisfaction with the employee's job performance. Understandably the employee's self-induced perceptions of discrimination are insufficient to establish a genuine issue of fact (*Hights v. International Harvester Co.,* 675 F.Supp. 418, 424 (N.D.Ill.1987); cf. *Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 924 (7th Cir.1988) (upholding summary judgment for employer because employee's "own self-interested assertions concerning her abilities are not in themselves sufficient to raise a genuine issue of material fact")). No *evidence* reasonably creates an inference that Nellis was terminated because of his age.

### Conclusion

Nellis has failed to establish any genuine issue of material fact requiring trial. Service Web is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

---

**7.** Nellis Mem. 15 suggests that his alleged replacement by younger employees evidences discrimination. But that fact standing alone (as it does here) does not suffice to create an inference of discriminatory intent. *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1224 (7th Cir.1980) (per curiam) approved this statement of the reason underlying that principle, taken from *Langesen v. Anaconda Co.,* 510 F.2d 307, 313 (6th Cir.1975):

> It is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market, while younger ones move in.