**Ernest A. CHILDRESS, Plaintiff,**

v.

**ARCATA GRAPHICS COMPANY, Defendant.**

**No. 90 C 6530.**

United States District Court, N.D. Illinois, E.D.

Jan. 22, 1992.

Wilfred F. Rice, Jr., Chicago, Ill., for plaintiff.

Michael C. Hallerud, Bernadette M. Davison, Pettit & Martin, San Francisco, Cal., Julie Hart, Matkov, Salzman, Madoff & Gunn, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Ernest Childress ("Childress") claims that Arcata Graphics Company ("Arcata") fired him because of his age (47 at the time of his dismissal), in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. Arcata now moves for a summary judgment in its favor under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, its motion is granted.[1]

---

1. To facilitate the resolution of Rule 56 motions, this District Court's General Rule ("GR") 12 requires the parties to file factual statements, citing to the record in support of each fact alleged or disputed. Arcata's statement will be cited as "D. 12(m)" and Childress' as "P. 12(n)." As for the operative standards, Rule 56 assigns to Arcata the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court must resolve all factual disputes and draw all "reasonable inferences, but not every conceivable inference" in favor of Childress as the nonmovant (*De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)). But because Childress cannot create a factual dispute under Rule 56 unless he complies with GR 12(n) (see, e.g., *Appley v. West*, 929 F.2d 1176, 1179–80 (7th Cir.1991) (per curiam) and cases cited there), this opinion must adopt Arcata's view of facts wherever Childress' attempts to raise a dispute fly in the face of that

GR. Unfortunately, there are too many such examples here:

—Any denial for lack of personal knowledge (see, e.g., P. 12(n) ¶¶ 25–31) has the effect of an admission. GR 12(n) should not be confused with Rule 8(b), which permits such deemed denials in a defendant's answer.

—Any denial supported by a vague citation such as "see plaintiff's affidavit generally" (see, e.g., P. 12(n) ¶ 33) also has the effect of an admission. GR 12(n) expressly requires "specific citation" to relevant portions of the record. In particular, the cited general reference cannot overcome the express and properly supported GR 12(m) statements.

—Additional facts alleged under GR 12(n)(2) must be disregarded completely if unsupported by any citation at all (see, e.g., P. 12(n) ¶¶ 46–55).

If anything, those errors tend to make the court's job easier by reducing the number of potential disputes. Clients cannot so easily avoid the consequences of their lawyers' mistakes.

## Facts

Arcata is a wholly owned subsidiary of Arcata Corporation. It sells printing services on behalf of separate but affiliated printing companies. Arcata's Book Group divides its sales force into eight regions, each run by a regional manager reporting to the corporate vice-president of book sales. Book Group headquarters are in Tennessee (D. 12(m) ¶ 4).

Childress was born in 1943 (*id.* ¶ 1). He worked for Arcata's Book Group from 1973 to 1977 as a sales representative, then rejoined it from 1983 to 1990—first as a senior sales representative and then as an account executive, a different title that carried the same duties (*id.* ¶¶ 2–3).[2] Childress worked in Arcata's Midwest Region in its Arlington Heights, Illinois sales office (*id.* ¶ 5). His duties included business development, the handling of existing customers' needs, setting and meeting sales targets, and coordinating the work of the customer service, pricing and credit departments (*id.* ¶ 6).

Sales in Arcata's Midwest Region declined in the mid-to-late 1980s from about $50 million to about $37 million. In November 1987 Arcata named Paul Barrett ("Barrett") vice president and regional sales manager for the Midwest Region, instructing him "to motivate and build the [region's] sales force" with a special emphasis on new account development (*id.* ¶ 9). Childress reported to Barrett (*id.* ¶ 8).

Friction between Barrett and Childress developed almost immediately. Childress told Barrett that he was assigned unpromising accounts and that his sales typically peaked late in the year (P. 12(n) ¶ 10, Childress Aff. ¶ 7). Nonetheless, between January 18 and March 31, 1988 Barrett sent Childress a series of five written warnings about his asserted failure to meet past sales goals, the urgent need to develop new accounts and the requirement (apparently imposed on Childress but not on other salesmen) that Childress report frequently and in writing on his progress in generating new business (*id.* ¶ 10; Barrett Aff.Ex. B).[3]

In the fourth memo Barrett explicitly threatened Childress with termination if his performance did not improve (Barrett Aff. Ex. B at 6[4]). In the last memo Barrett emphasized that he expected Childress and other veteran sales representatives to meet high sales standards "considering the investment Arcata has made in you in terms of your salary, car, expense budget, insurance, etc." (*id.* at 7).

Childress complied with Barrett's requests as to making new sales calls and filing reports (P. 12(n) ¶ 11; Childress Aff. ¶ 8; Barrett Aff.Ex. L at 3 ¶ 2). Even so, at the end of the first quarter of 1988 Barrett recommended to his superiors that they fire Childress, largely because he had failed to meet his sales plan for the three prior fiscal years (D. 12(m) ¶ 11). Childress had fallen short of his plan every year between 1984 and 1987, despite the fact in each of these years his plan was the lowest of any salesman in Arcata's Midwest Region (D. 12(m) ¶ 15).[5] At the same time that Barrett recommended Childress' dismissal, he also recommended that upper management fire another poor-performing salesman, 41–year–old Larry Fansler ("Fansler"). At that time management

---

**2.** This opinion uses the titles interchangeably.

**3.** There is some arguable dispute about whether Childress received those memos. At his deposition he testified that he did not recall receiving them, but did not explicitly deny such receipt (Childress Dep. 177, 275, 279). Even if Childress is granted the somewhat questionable inference that he did not receive the memos, the larger fact that Barrett was unhappy with his performance remains essentially undisputed. So does the fact that Childress knew Barrett wanted him to improve his performance: How else could he claim that he had "fully complied with every one of [Barrett's] directives" to that effect (Childress Aff. ¶ 8)? At any rate, it is Barrett's perception of Childress' performance, not the latter's own "self-interested assertions," that counts under ADEA (*Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 428 (7th Cir.1989)).

**4.** Because all the memoranda are part of a single Exhibit, this Court has numbered their pages consecutively for convenient reference.

**5.** For example, in 1987 he achieved just 63% of the sales total called for in his plan (Barrett Aff.Ex. B, letter dated Jan. 18, 1988).

agreed to fire Fansler but not Childress (D. 12(m) ¶ 12).

For 1988 Childress again had a relatively low sales plan: $2.056 million, second lowest in the region (*id.* ¶ 15). During that year Childress did develop a substantial amount of new business through Publications International, an existing Arcata account assigned to him when another salesperson left the firm (D. 12(m) ¶ 13). His performance against plan improved accordingly, to 153% in 1988 (Childress Aff.Ex. 7) and 102% in 1989 (Childress Aff.Ex. 2 at 34). In 1989 his plan again was modest: $2.97 million, third lowest among those who worked the entire year (*id.*).

Barrett remained dissatisfied with Childress, however, particularly in the area of business development. From 1986 through 1989 Childress developed 11 new accounts—and excluding Publications International, those accounts brought in $626,-141 in "gross less paper" sales, the standard yardstick for an account's value. Another of Childress' responsibilities was to generate sales quotes: bids to customers or potential customers for printing work. Childress made fewer sales quotes than his fellow salespeople, and his quotes had a lower dollar value. In 1987 only Fansler made fewer quotes than Childress, and it will be recalled that Fansler was fired for poor performance soon thereafter (D. 12(m) ¶ 19).

Barrett transferred two accounts from Childress to other salespeople, who generated significantly more business from these accounts than Childress had done. In the case of the Meredith account, sales went from a little over $300,000 to over $2 million within three years (D. 12(m) ¶ 18; Barrett Aff. ¶ 17), though Childress says that rapid increase may be credited to the groundwork that he laid in the account's early years with Arcata (P. 12(n) ¶ 18; Childress Aff. ¶ 9). In the case of the Baldwin–Cooke account, within two years sales went from zero under Childress to $1.3 million under salesman Bill Bold (D. 12(m) ¶ 18; Barrett Aff. ¶ 17). Childress does not claim to have laid the groundwork for that increase.

In November 1989 John K. Doyel ("Doyel"), then Arcata's vice president for book sales, sent Barrett and others a memorandum summarizing the results of an informal customer survey on sales responsiveness. Each salesperson was rated on a scale of 1 to 10. Childress ranked last among salesmen in his region, with a score of 2 compared to the average of 6. Next to Childress' name appeared the notation (evidently a summary of customers' comments) "[a]lways late; all rushes; no response" (P. 12(n) ¶ 21; Barrett Aff.Ex.B).

Arcata cites various other deficiencies in Childress' performance, including a messy office and poorly kept files that made it difficult for others to service Childress' accounts in his absence (D. 12(m) ¶ 22; Barrett Aff.Ex.E). Childress denies the particulars of that charge, but he admits receiving Barrett's written reprimand on the subject in February 1988 (Childress Dep. 288). As for the other matters to which Arcata refers, they include complaints from at least four "potentially significant" customers about Childress' inattention to their needs (D. 12(m) ¶ 20); inappropriate behavior with female staff members, such as calling them "honeypie" and "sweetie" (*id.* ¶ 21); and failure to resolve invoicing discrepancies promptly (*id.*). Childress denies each of those charges too (Childress Aff. §§ 10–12). Because neither side has documented its position beyond the bare-bones statements of the Barrett affidavit ("these things happened") and the Childress affidavit ("no, they didn't"), this Court must grant Childress the benefit of the doubt and treat the charges as groundless (though that does not lead to the inference that they were a coverup for age-based bias against Childress).

On June 27, 1989 Barrett and Childress met to discuss Childress' performance. In a memo to Childress the next day Barrett summarized his concerns, concluding, "Ernie, all of the danger signs are popping up again" (D. 12(m) ¶ 23; Barrett Aff.Ex. F). Three months later Barrett wrote to all salespersons in Childress' region, saying that "heavy emphasis will be placed on

New Account Development" in performance evaluations (Barrett Aff. Ex. G).

During 1989 Arcata recruited new sales representatives intensively (D. 12(m) ¶ 25), as part of a larger effort to shore up declining profits through increased sales activity (D. 12(m) ¶¶ 27–28; Christopher Mumford Aff. ¶ 3). Through that recruiting effort, in October 1989 Barrett hired David Robb ("Robb," age 46) and transferred Paul Cibulka ("Cibulka," age 34) to serve as sales representatives in the Midwest, performing roughly the same duties as Childress (D. 12(m) ¶ 26; Barrett Aff. ¶ 26 and Exs. H & I).[6] Cibulka had been working for two years as Manager of Human Resources and Sales Training in Arcata's Kingsport, Tennessee headquarters. In early November 1989 Arcata (through its advertising agency) placed a recruiting advertisement for sales representatives to appear in the December 1989 and January and February 1990 issues of a trade magazine called *Printing Impressions* (D. 12(m) ¶ 40; Barbara Johnson Aff. ¶ 3 and Exs. A & B).

Those expansion and recruitment activities evidently did little to stem Arcata's financial decline. Robert Swam, who had instigated the activities as Arcata's president, was fired in September 1989 (Mumford Aff. ¶ 4). Budget planning sessions conducted in November 1989 revealed that profits were still headed south (year-end data later showed a 75% loss in profits, *id.* ¶¶ 5–6; D. 12(m) ¶ 27).

After Swan's departure Edward Scarff, chairman and CEO of Arcata's parent company, assumed direct responsibility for Arcata. Under Scarff's leadership Arcata attempted to solve its problems through retrenchment rather than increased sales activity (Mumford Aff. ¶¶ 4–6). All recruitment activity came to a halt in November 1989 (D. 12(m) ¶ 28; Doyel Aff. ¶ 5). About December 1 Arcata cancelled the *Printing Impressions* advertisement (D. 12(m) ¶ 40; Johnson Aff.Ex. A), but the cancellation deadline for the December issue had already passed. Hence the ad ran in December but not in January or February (D. 12(m) ¶ 40; Johnson Aff. ¶ 3(c)).

Scarff also ordered a $5 million cut in the company's 1990 budget (D. 12(m) ¶ 28; Mumford Aff. ¶ 7). Arcata's Executive Vice President Bill Hepler ("Hepler") therefore ordered a reduction in force ("RIF") and told Doyel that book sales personnel would be subject to the RIF (D. 12(m) ¶ 28; Doyel Aff. ¶ 5). Before telling his regional sales managers about that order from Hepler, Doyel asked each of them to submit performance evaluations of all their sales personnel (D. 12(m) ¶ 29; Doyel Aff. ¶ 6). Barrett did not know of the impending RIF when he prepared his November 15, 1989 evaluations (Barrett Aff. ¶ 27), in which Childress ranked twelfth out of thirteen—above only David Robb, whom Barrett deemed "too new to evaluate" (Doyel Aff. Ex. A).

Sometime thereafter Doyel orally informed Barrett of the impending RIF (Doyel Aff.Ex. B, ¶ 1). On December 4, 1989 Doyel sent Barrett a memo confirming that the RIF would occur and ordering him to recommend one sales representative to be fired. Doyel's memo laid out a schedule, targeting January 5, 1990 as the date of termination, and emphasized that "relative job performance is the sole criteria [sic] to be used" in deciding whom to fire (D. 12(m) ¶ 30; Doyel Aff.Ex. B). Employees were to be evaluated primarily on 1989 performance; five-year performance was to be considered where recent performance was unrepresentative; and for new hires Barrett was to make a subjective evaluation of potential performance based partly on prior work experience (Doyel Aff.Ex. B at 1). Doyel attached a computer printout of 5-year data for the six most experienced salespeople under Barrett's direction. That printout reflected that Childress was the poorest performer in the group over time (Doyel Aff.Ex. B at 3). Doyel did not tell Barrett either (1) that only those six men were candidates for the RIF or (2) that

---

6. Both of these employees remain employed by Arcata. Childress claims that Robb was discharged on October 16, 1989 (D.Mem. 11), but

Arcata's personnel records show otherwise (P.Ex. 2 at 37).

Barrett should focus on the six as primary candidates for the RIF.

Doyel sent a carbon copy of his memorandum to Cibulka among others, and he urged Barrett to consult with Cibulka if Barrett needed any help in the RIF process (Doyel Aff.Ex. B at 2). Barrett had hired Cibulka two months earlier to work as a salesman, but Cibulka was still in training at the time of the RIF and did not begin work as a sales representative until about January 1, 1990 (Barrett Aff. ¶ 26). Evidently Doyel copied him on the memo in his capacity as a personnel manager. Cibulka did not approve or otherwise participate in the decision to lay off Childress (Doyel Aff. ¶ 10), although obviously he knew that a RIF was in the works and helped in the general planning of the RIF (*id.*). Cibulka himself was explicitly considered for elimination pursuant to the RIF (Barrett Aff. ¶ 31).

Barrett then prepared and forwarded to Doyel a set of twelve written evaluations dated December 6, 1989 and covering each of the sales personnel in the two offices under his direction.[7] Again Childress ranked last. On a scale from 1 to 7 Barrett rated Childress at 3.83 (as against the best salesman's 6.17 and an overall average rating of 4.68) (D. 12(m) ¶ 31; Barrett Aff. ¶ 29 and Ex. L). In contrast, Barrett's predecessors had rated Childress at 6.0 in 1986 (Childress Aff.Ex. 5) and 6.4 in 1985 (Childress Aff.Ex. 6). In those years Childress had received substantial merit increases in pay (Childress Aff. ¶ 60).

Barrett's narrative comments about Childress in the December 6 evaluation were also generally negative. Typical comments included: "his numbers are reported considerably higher than what is actually being sold," "spends too much time processing small orders for small customers," and "overlooks the incredible [growth] potential on his own [account] list" (Barrett Aff.Ex. L).

Barrett recommended to Doyel that Childress be fired pursuant to the RIF. Doyel and two other executives, Clyde Briggs and Burgess Hildreth, reviewed and approved the recommendation, and Childress was terminated effective January 5, 1990 (D. 12(m) ¶ 34). Under the RIF a company-wide total of 13 employees were laid off (D. 12(m) ¶ 38; Doyel Aff. ¶ 10). Five of those 13 employees were over age 40 and eight were under age 40 (Jane Downs Aff. ¶ 3).

Childress maintains that there was no RIF in the Midwest Region where he worked, because by Arcata's own admission the office was staffed with 11 salespeople on December 31, 1989 (before Childress was fired) and with 11 salespeople four months later (Childress Aff. ¶ 18). But Childress does not properly counter (see n. 1), and thus is deemed to have admitted, Arcata's statement in D. 12(m) ¶ 33 that Cibulka was included in the pool of potential RIF victims even though he did not start work in the office until January 1990. Thus the relevant numbers are 12 (employees considered for elimination in December 1989) and 11 (employees remaining in April 1990). Childress also ignores, and thus admits, Arcata's contention that 13 employees lost their jobs company-wide. This Court therefore is required to accept Arcata's properly supported assertion that a RIF in fact occurred.

There is also some dispute over the status of Robert Nuelle ("Nuelle"), who was hired to work in Arcata's Chicago office on March 5, 1990 (Childress Aff.Ex. 8; Barrett Aff.Ex. M). Arcata claims that Nuelle was hired by an Arcata sister company (Arcata Graphics Kingsport) and was assigned to work out of Arcata's Chicago office although his supervisor works in Kingsport (D. 12(m) ¶ 41; Downs Aff. ¶ 6; Barrett Aff. ¶ 33). And the earliest record reference to Nuelle's employment is found in a February 22, 1990 memo on the letterhead of Arcata Graphics Kingsport (Childress Aff.Ex. 13).

Childress maintains that Nuelle was in fact hired by Arcata, then promptly transferred to Arcata Graphics Kingsport. He notes that on the personnel form recording Nuelle's hiring he is listed under "potential

---

7. Childress' evaluation is part of the public record of this case. Arcata has filed the other

11 under seal, to protect the employees' privacy, and this Court has reviewed all 11.

status" as an employee of Arcata, and only on a later form is he listed as an employee of Arcata Graphics Kingsport (Childress Aff. ¶ 19, P. Exs. 8, 9). Although that provides a slender reed for Childress to lean on, this Court must resolve such a factual dispute in his favor.

Nuelle sells pre-press services, a job that Childress could not have done full-time without additional training (Childress Aff. ¶ 20–21). Nuelle holds the title of Composition Sales Account Executive (Childress Aff.Ex. 13), a title held by none of the employees considered for elimination in the 1989 RIF (Barrett Aff.Ex. L). Even granting the assumption that Arcata and not the sister company was briefly Nuelle's employer of record, his presence in the Chicago office does not tend to disprove that a RIF occurred as depicted by Arcata.

During the relevant time period Arcata hired one new sales representative over 40 (Robb) and fired two over 40: one (Fansler) for cause and one (Childress) pursuant to the RIF. It hired six sales personnel under 40 (Bold, Cibulka, John DiMasi, Eric Hall, Robert Howlett and Mark Schoenborn) (Childress Aff.Ex. 2). It retained two sales personnel over 40 (Don Axe and Larry Dickenson) (*id.*). Another sales representative over 40 retired (Ernie Solt) (*id.*) [8] All four managers responsible for terminating Childress were over 40: Doyel was 48, Barrett 42, Briggs 53 and Hildreth 48 (D. 12(m) ¶ 34).

### Rule 56 Principles

■ Rule 56 requires this Court to rule in the moving party's favor if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." To demonstrate that an issue is genuine the movant must cite to some evidence in the record sufficient to suggest that its view of the issue might be adopted by a reasonable jury (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Billups v. Methodist*

*Hosp. of Chicago*, 922 F.2d 1300, 1304 (7th Cir.1991)). To demonstrate that an issue is material the moving party must show that the issue is outcome-determinative under the applicable substantive law (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)). Thus a brief outline of the rules of decision under ADEA is the next order of business.

### ADEA Principles

■ Every ADEA plaintiff bears the ultimate burden of proving "that he was discharged because of his age" (*Oxman v. WLS-TV*, 846 F.2d 448, 452 (7th Cir.1988). Typically, as in this case, a plaintiff lacks a "smoking gun" and therefore attempts to prove discrimination through indirect evidence, calling into play the familiar doctrine of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) in which the burden of production (though not of proof) swings back and forth enough to produce whiplash. That approach has long been held applicable to ADEA cases (*Oxman*, 846 F.2d at 452).

■ When disputing dismissal pursuant to a RIF, plaintiff must first show that he or she was (1) within the protected class, (2) performing up to the employer's legitimate expectations, (3) terminated and (4) treated less favorably than others in the protected class (*Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1318 (7th Cir. 1989)). That triggers a rebuttable presumption of discrimination, and the employer must then articulate legitimate, nondiscriminatory reasons for termination (*id.*). That having been done, plaintiff reassumes the burden of production and must make a showing that the employer's proffered reasons are pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's

---

**8.** Childress claims that Solt was discharged (P.Mem. at 11) but offers no evidence on that score. All that is certain is that Solt left Arcata at age 56 in January 1989. Arcata says that Solt retired "after nearly 33 years of mutually satisfactory service" (P.R.Mem. 9), and there is nothing in the record to support the inference that he was fired.

proffered explanation is unworthy of credence" (*Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095).

■ Evidence of pretext permits but does not compel the ultimate conclusion that age motivated the dismissal (*Perfetti v. First Nat'l Bank*, 950 F.2d 449, 451 n. 4 (7th Cir.1991)). More to the point in the present context, once offered such evidence compels the denial of summary judgment if it is sufficient to persuade a reasonable trier of fact by a preponderance of the evidence that age motivated the dismissal (*Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570 (7th Cir.1989)). So while this Court may not evaluate the *credibility* of evidence on summary judgment (*Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510), to that extent it must evaluate the *weight* of evidence.

### Application of the Law to the Facts

■ Arcata first argues that Childress failed to perform up to its legitimate expectations, so he has not made out a prima facie case.[9] Proving the prima facie case on that point may be the only easy thing for a discrimination plaintiff to do in this Circuit, and Childress has done it. For that purpose even a plaintiff's own testimony about his or her job performance may suffice (*Weihaupt*, 874 F.2d at 428), even though without the slant required by Rule 56 such evidence may not look terribly persuasive (*Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir.1990) and even though the same self-serving testimony cannot alone ultimately forestall summary judgment (see, e.g., *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir.1989)).

As *Grant v. Gannett Co.*, 538 F.Supp. 686, 689–90 (D.Del.1982) has aptly put the matter, a plaintiff need only produce substantial evidence of satisfactory job performance. To require plaintiff to produce more at the first ping of the *McDonnell Douglas–Burdine* ping-pong match—to demand enough evidence to rule out the possibility of having been discharged for inadequate performance—would convert the prima facie case into the entire case.

Here we have Childress' own testimony and more. His improved performance against his sales plan in the two years before his termination makes his overall performance look at least minimally adequate. Moreover, that improvement came in part *after* the time when management refused Barrett's request to fire him for poor performance—suggesting that but for the RIF Childress might have been retained. Even the December 6 evaluation of Childress by Barrett,[10] though largely negative, hardly describes the sort of utter failure to meet basic job requirements that would show an inability to prove the prima facie case (see, e.g., *Villa v. City of Chicago*, 924 F.2d 629, 631 (7th Cir.1991) and this Court's opinion in *Nellis v. Service Web Offset Corp.*, 695 F.Supp. 398, 402 (N.D.Ill. 1988)). On the whole, seen from Childress' viewpoint, the evidence is quite like that found adequate in *Shager:* It paints a picture of a salesman who "in his zeal to sell . . . failed to attend as assiduously as he might have done to the drabber managerial aspects of his job, but his *overall* performance was . . . at least as good as that of his peers" (913 F.2d at 401 (emphasis in original)).

It is crucial, though, not to confuse the inquiry just concluded with the one about to begin. Given the very low hurdle posed by the prima facie case, an employer may well be able to proffer "legitimate, nondiscriminatory reasons" for a dismissal even if the employee "meets legitimate expectations" for purposes of the prima facie

---

**9.** Childress obviously falls into the protected class (age 40 and up) and just as obviously was terminated. Arcata does not challenge the adequacy of Childress' proof on the last element (treatment of others in the protected class), so this opinion will not do so either. Job performance is thus the only element of the prima facie case now at issue.

**10.** Because that was the one closest in time to his dismissal, it was the most relevant (*Karaza-*

case.[11] As the courts have been compelled to repeat ad nauseam, the civil rights laws did not rewrite the basic American doctrine of employment at will. An employer may legally fire an employee who is performing well in some sense but not well enough in some other sense valued by the employer. "Of course it is not a violation of the age discrimination law to fire an employee for insufficient cause" (*id.*, 913 F.2d at 401; similarly, see *Nellis*, 695 F.Supp. at 403).

■ Clearly Arcata has proffered legitimate, nondiscriminatory reasons for its dismissal of Childress. Its business was in decline. To stem the decline it planned a RIF. Pursuant to the RIF it fired an employee who, though adequate in some respects and perhaps even excellent in a few, had caused his supervisor much grief in others.

Most importantly, among the various memoranda, statistics and affidavits that so amply demonstrate Barrett's longstanding concern with Childress' performance there is not a wisp of a suggestion, let alone any explicit indication, that Barrett cared about Childress' age. All his initial concerns were age-neutral and closely linked to Childress' performance as compared with his job description, and as in *Timms v. Frank*, 953 F.2d 281, 287 (7th Cir.1992) the ultimate decision to recommend Childress for termination appears to have been made in compliance with Doyel's written criteria for the selection of a RIF victim. Such a combination of economic exigency and rational concerns about performance surely provides legitimate and nondiscriminatory grounds for dismissal (see, e.g., this Court's opinion in *Haynes v. Alumax Recycling Group, Inc.*, 719 F.Supp. 707, 711 (N.D.Ill.1989), *aff'd*, 899 F.2d 16 (7th Cir.1990) (where plaintiff's position was really eliminated, RIF is a legit-

imate and nondiscriminatory ground under ADEA)).

■ Even if this Court were to indulge an extreme pro–Childress viewpoint, the most that the evidence could be said to imply is that Barrett engaged in some sort of vendetta against Childress, consistently emphasizing the negative aspects of a mixed track record in order to turn upper management against him. Under the at-will doctrine embodied in ADEA case law, even such unsavory motives for dismissal must be considered legitimate and nondiscriminatory.

At that point then the burden reverts to Childress, who must offer proof of pretext. Childress does not purport to offer evidence that might directly persuade a trier of fact that a discriminatory reason more likely motivated Arcata. Instead he emphasizes that Arcata's explanation is "unworthy of credence" within the meaning of *Burdine*, as quoted and applied by our Court of Appeals in *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1364 (7th Cir. 1988)—that Arcata's proffered reasons lack any factual basis; that if they have a factual basis, they did not really motivate the termination; or, if they were factors in the termination, that they were not sufficient to motivate the discharge (*Smith*, 876 F.2d at 1319). To that end Childress may offer two types of indirect evidence of pretext (*Perfetti*, 950 F.2d 449, 451).

There is a third type of evidence that Childress might seek to tender (*id.* at 451):

> direct evidence of pretext, such as a contradiction between the employer's proffered justification at trial and documentary evidence from the time of the decision, or a contradiction among the witnesses to the employment decision at issue.

---

nos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 336 (7th Cir.1991)).

**11.** Of course, if it were possible to set aside the clumsiness of the *McDonnell Douglas–Burdine* procedure when interwoven with summary judgment law, those issues really would become one and the same: Just how well was the employee really doing his or her job? When the evidence is clear that the employee did a con-

sistently awful job, it therefore does make sense to collapse the two inquiries into one, sparing all concerned the trouble of going analytically beyond the prima facie case (see, e.g., this Court's opinion in *Nellis*, 695 F.Supp. at 402). But when as here the evidence on performance is mixed, our Court of Appeals properly requires that a district court dance the entire "*McDonnell Douglas* quadrille" (*Shager*, 913 F.2d at 401).

There is no such evidence. Arcata's story is consistent across time and across witnesses.[12]

Under *Perfetti, id.* at 451 Childress may also offer a fourth type of evidence:

> circumstantial evidence of pretext, such as evidence that the proffered justification is not a genuine job requirement or has been inconsistently applied to other employees.

Childress' efforts at proof fall into that latter category.

Yet he obviously has not shown that the proffered reasons lack any basis in fact, which is the first avenue of proof on the *Mechnig* roadmap. Arcata has supplied ample, largely unrebutted evidence of its financial straits, its specific concerns with Childress' performance and the RIF policies and procedures.

■ Nor has Childress shown (in an effort to follow the second *Mechnig* avenue) that the proffered reasons did not actually motivate his discharge. To see why that is so, it is necessary to review Childress' own summary of the evidence (P. Mem. 11–12). Here are the eight points that he makes, urging that taken together they could at trial prove Arcata's explanation to be unworthy of credence.

1. *Childress has satisfied his prima facie case.* True but irrelevant. That gets Childress over an initial hump but cannot preclude summary judgment.

2. *At the time of the purported RIF, Arcata "simultaneously acquired" two new and younger employees, Cibulka and Nuelle.* Wrong. It is indisputable that a RIF in fact occurred. Childress' attempts to contest that fact have failed. For instance, he claims that Arcata was recruiting at the time of the RIF because it ran the ad in *Printing Impressions.* But the undisputed evidence is that Arcata cancelled the ad when the cutbacks began. Arcata hired Cibulka before the RIF, then actually considered him as a potential RIF victim and decided to retain him. It hired Nuelle *after* the RIF to do a job different from the one Childress had performed.

3. *Childress was meeting Arcata's legitimate expectations.* Agreed for prima facie purposes, but redundant of point 1 and equally irrelevant.

4. *Arcata engaged in a "pattern and practice" of discharging older employees while hiring younger ones.* Childress lists four employees over the age of 40 who were allegedly discharged under Barrett's direction: Childress, Fansler, Robb and Solt. Only Childress and Fansler were actually discharged, while Solt retired and Robb still works at Arcata. Childress also lists six younger employees hired. That list however omits Robb, who was 46 when hired and thus within the ADEA-protected class. So the real box score reads: two older workers fired, one older worker hired, six younger workers hired. No reasonable jury could find a net loss of one older worker probative of a "pattern or practice" of discrimination, especially when there is undisputed evidence that the one older worker other than Childress was fired for cause.

5. *Arcata "expressly eliminated" younger salespeople from consideration as RIF victims.* Doyel sent Barrett five-year sales data for all salespersons with a five-year track record. But he did not instruct Barrett that younger salespeople were immune from the RIF, and Barrett did in fact evaluate those salespeople as possible targets of the RIF.

6. *Barrett gave Cibulka a better performance review than Childress, even though the younger man had not yet*

---

**12.** Childress argues that Arcata has in fact changed its story, because Barrett told him at the time of dismissal that his dismissal was related to the RIF and not to his performance (Childress Aff. ¶ 27). All that tends to prove is that Barrett told the sort of white lie that any employer might tell under the circumstances. For Arcata does not contend that it dismissed Childress for *poor* performance as such—indeed, it specifically declined Barrett's request to do just that in 1988. Arcata rather dismissed Childress because it was undergoing a RIF, and under the RIF criteria it singled out Childress as a relatively poor performer. There simply is no inconsistency.

*begun work as a salesman.* Barrett reviewed Cibulka according to the criteria given him by Doyel. If a salesperson had no track record, Barrett was to make an evaluation based on his best estimate of the person's potential. And he made such evaluations both for Cibulka (age 34) and Robb (age 46).

7. *Arcata replaced Childress with the younger Cibulka.* Arcata hired Cibulka in the fall of 1989, pursuant to a policy of corporate expansion. It fired Childress on January 5, 1990, pursuant to a more recent policy of corporate retrenchment. There was no linkage between the two actions.

8. *Arcata did not give Childress the chance to fill the position given to Nuelle.* Arcata had no obligation under contract, statute or case law to retrain Childress or give him priority consideration for new positions. Childress cites only one case for the proposition that Arcata had such an obligation—*Metz v. Transit Mix, Inc.*, 828 F.2d 1202, 1209–10 (7th Cir.1987)—but it says nothing of the kind. *Metz* does suggest that an employer who fires an older worker specifically to avoid paying his or her high salary must instead pursue less-detrimental alternatives, such as "continued employment ... in a different position" (*id.* at 1208). But *Metz*—which flatly forbids the firing of older workers simply on the grounds that they earn more than a younger replacement would—applies only where the fired worker is replaced with a younger person (*id.* at 1211). There was no replacement hired here, so *Metz* does not apply.

*Metz* does open up another possible argument that bears brief discussion. On March 31, 1988, around the time he first attempted to have Childress dismissed, Barrett told Childress that he had to meet certain performance standards in light of his experience and the investment that Arcata had made in him in the form of salary and benefits (Barrett Aff.Ex. B at 7). If this Court were to credit for the moment Childress' supposition that Cibulka was hired to replace him, that memorandum might be thought highly probative of discrimination under *Metz*. There the majori-

ty stressed that higher performance standards nominally based on the higher pay and benefits accorded to senior employees may violate ADEA, given the strong correlation between seniority and age (828 F.2d at 1209).

But courts may find that an employer used pay and benefits as a proxy for age only "on a case by case basis where the facts support [their] use" (*id.* at 1208). This is not such a case. Barrett's memorandum simply states that after five years with the company an employee ought to achieve at least $3 million in annual sales. Each employee's sales plan was contingent on experience and past performance, not age. Doyel's list of five-year veterans (Doyel Aff.Ex. B at 3) included Mark Rowlett and Gary Abraham, both of whom were under 40 (P.Ex. 3) but had sales plans of at least $3 million between 1987 and 1989 (P.Ex. 2 at 34). John DiMasi, a 32–year–old colleague of Childress who had performed exceptionally well in his first two years with Arcata, had an $11 million sales plan in 1989 (P.Ex. 2 at 34). There is no rational basis to infer that Barrett's announced $3 million standard for veterans was in fact a proxy for weeding out older workers.

Finally, Childress offers nothing to satisfy the third *Mechnig* alternative: that the proffered reasons were insufficient to motivate termination. Arcata's proffered reason is its RIF program. By having shown that the RIF program actually existed and was carried out according to its own stated terms, Arcata has ipso facto shown reasons sufficient to motivate termination.

### Conclusion

D.Mem. 13 says "the singular, critical issue here (once again) is whether 'reduction in force' is a credible explanation for the defendant's action in causing the plaintiff's discharge." It is. There is no genuine issue of material fact, and Arcata is entitled to a judgment as a matter of law. This action is dismissed.