**Vincent O. HAYNES, Plaintiff,**

**v.**

**ALUMAX RECYCLING GROUP, INC., et al., Defendants.**

**No. 88 C 7046.**

United States District Court, N.D. Illinois, E.D.

July 24, 1989.

---

Amy Louise Beckett, Leon M. Despres, Despres, Schwartz & Geoghegan, Chicago, Ill., for plaintiff.

Raymond J. Kelly, Thomas J. Piskorski, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Vincent Haynes ("Haynes") has sued Alumax Recycling Group, Inc. ("ARG"), its parent company Alumax, Inc. ("Alumax") and its grandparent Amax, Inc. ("Amax"),[1] asserting a violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. This Court denied defendants' initial motion to dismiss Haynes' Complaint on untimeliness grounds in *Greanias v. Sears, Roebuck & Co.*, 697 F.Supp. 1025 (N.D.Ill.1988) (combined opinion in two similar cases).[2] Now defendants have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, the motion is granted and this action is dismissed.

### Facts [3]

In March 1956 Haynes began working as an accounting clerk for Apex Smelting Company ("Apex"). In August 1962 ARG acquired Apex and, although Haynes then became an ARG employee, he continued his duties at the Apex plant in Chicago. Eventually he rose to the level of plant comptroller, but he later transferred to ARG's Des Plaines, Illinois office, where he performed general accounting duties until his termination in April 1987.

In 1977 ARG owned five secondary aluminum facilities: in Long Beach, California; Chicago, Illinois; Checotah, Oklahoma; Cleveland, Ohio; and Bicknell, Indiana. By 1983, however, only the Cleveland and Bicknell facilities were functioning. In that year ARG acquired three aluminum can recycling centers ("can centers"): in Philadelphia, Pennsylvania; Arlington, Texas; and Houston, Texas. Although the Philadelphia center closed shortly after its acquisition, the other two can centers remain viable today.

From 1984 until his termination Haynes reported to David Mitchell ("Mitchell"), who was originally ARG's corporate Comptroller, then its Vice President of Finance and Administration. At the time of Haynes' termination Milton Richmond ("Richmond"), who had known Haynes since their early days together at Apex, was ARG's President and general manager. Richmond and Bond Evans ("Evans"), Executive Vice President at Alumax, made the decision to terminate Haynes along with three other employees.

In 1977 Haynes' duties primarily comprised all accounting procedures and related responsibilities for ARG's five plant operations and the Des Plaines office. When ARG acquired the can centers, Haynes originally performed similar duties for those operations. But in 1984 many of Haynes' duties as to the two remaining can centers (Arlington and Houston) began to be transferred to Texas at Mitchell's election. For that purpose ARG needed someone on site at the can centers to perform those duties. Coincidentally an Alumax subsidiary plant in nearby Rockwall, Texas was then closing, and Richmond obtained the names of candidates there to perform scrap trading and bookkeeping duties for the can centers. That resulted in Yvonda

---

1. In each instance the subsidiary (ARG or Alumax) is wholly owned by its corporate parent.

2. All facts as to the filing of Haynes' EEOC complaint and its timeliness (discussed in *Greanias*) are omitted here because they do not bear on the current motion.

3. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Haynes (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

Nix ("Nix")[4] being hired from Rockwall because of her experience there in both scrap buying and accounting. Nix retained the title of Administrative Coordinator.

By September 1986 Nix was carrying out most of the duties for the can centers. Des Plaines still handled the salaried payroll (as it did for all ARG branches), while Nix handled the hourly payroll. At that time the Cleveland facility had just been sold, and it was common knowledge that ARG was in the process of selling Bicknell as well.

After the Bicknell sale ARG operated only the Texas can centers and the Des Plaines office, and thus there was little accounting work left to do in Des Plaines. Accordingly Richmond and Evans decided in December 1986 to implement a reduction in force ("RIF") at the Des Plaines office. Four individuals were terminated: Haynes (age 57), Tom Bastuba ("Bastuba") (age 39), Tom Manley ("Manley") (age 43) and Dennis Norton ("Norton") (age 36).

On January 26, 1987 Haynes was notified that he was being terminated pursuant to the RIF effective April 30, 1987. Although ARG had once had a policy to provide two weeks of severance pay per year of service, after 1984 the policy in force provided for one week of pay per year (a change of which Haynes was unaware). Haynes received the one-week-per-year benefit plus accrued vacation, full medical and life insurance benefits throughout 1987, and a $2,000 bonus if he remained with ARG until April 30, 1987.

Norton, although terminated at the same time as Haynes under the same policy, later formed a computer consulting business that has periodically been retained by ARG on an hourly basis. Bastuba received his $2,000 bonus, although he left before April 30, 1987 after finding a job with the help of ARG's outplacement service. Manley also received the same benefits package

as Haynes—but because ARG accommodated Manley as to some surgery, he actually received several additional weeks of what could be construed as severance pay.

After Haynes was RIFed by ARG he received a job offer from Standard Alloys and began working there on June 1, 1987. That job lasted until Standard Alloys' bankruptcy in November 1987. After a brief period of unemployment, on May 1, 1988 Haynes began working at Allied Metal Company, a job he holds today.

After Haynes left ARG, all of his duties were performed either by Nix in Texas or by Mitchell in Des Plaines. That situation had changed by early 1988, when Mitchell decided to leave ARG, although he did remain until January 1989, when he was terminated due to a further RIF. Since then Mitchell has been acting as an ARG consultant four days per month, during which time he continues to perform Haynes' former duties.

Meanwhile, in Texas Nix began to devote herself full time to her scrap buying duties. ARG hired Doug Drerup, an under–30–year–old male, to take over her accounting duties.

During his term at ARG, Haynes was present when Richmond told a group of people that Evans had bragged how it was simple and very easy to get rid of employees over age 45. Haynes also overheard Richmond say to Mitchell on at least two or three occasions that he was going to "get rid of" Haynes.

### ADEA Claim

Haynes falls into the category of the age group (40 to 70 years old) protected by ADEA. *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988) teaches:

> Thus, a terminated plaintiff's ultimate burden in an age discrimination case is to prove that he was discharged because of his age.[5]

---

**4.** Nix apparently underwent several surname changes over the time period relevant to this case. This opinion will stick to "Nix" to avoid confusion.

**5.** [Footnote by this Court] This opinion will refer to what an ADEA plaintiff must prove,

because that is the form in which the controlling cases address the requirements. It should, however, be emphasized that in the present context—involving opposition to a summary judgment motion—all Haynes must do is to advance evidence that (with reasonable inferences in his favor) creates a material factual issue, rather

That does not call for proof "that age was the sole factor motivating the employer's decision, only that age was a determining factor in the sense that he would not have been fired but for the employer's motive to discriminate on the basis of age" (*id.*).

Where (as here) a plaintiff offers no direct or circumstantial evidence that age was a determining factor in the discharge, he or she must turn to the indirect, burden-of-production-shifting method of proof originally established for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and later adapted to ADEA claims (*Ayala v. Mayfair Molded Products Corp.,* 831 F.2d 1314, 1318 (7th Cir.1987)).[6]

To establish a prima facie case in a RIF situation such as this one, a plaintiff must show (*Smith v. General Scanning, Inc.,* 876 F.2d 1315, 1318 (7th Cir.1989), citing *Oxman,* 846 F.2d at 455):

> (1) that he was within the protected age group; (2) that he was performing according to his employer's legitimate expectations; (3) that he was terminated; and (4) that others not in the protected class were treated more favorably.

Both remaining steps in the *McDonnell Douglas* framework—the shifting of the burden to the employer to produce a legitimate, nondiscriminatory reason for the discharge (step 2), followed by a burden-shift back to plaintiff to offer proof that such proffered reason is pretextual (step 3)—are identical in a RIF case (*Smith, id.* at 1318). Finally, as this Court said in *Nellis v. Service Web Offset Corp.,* 695 F.Supp. 398, 401 (N.D.Ill.1988) (emphasis in original):

> And of course the teaching of *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) is that the burden of *persuasion* of intentional discrimination always remains on the employee.

Defendants offer two independent grounds on which summary judgment should be granted:

> 1. Haynes cannot establish the fourth prong of his prima facie case—that others not in the protected class were treated more favorably.
>
> 2. Haynes cannot establish that defendants' articulated reason for termination was pretextual.

If defendants establish the truth of either of the above assertions (in the sense required by n. 5), that will require the entry of summary judgment in their favor. This opinion examines each ground in turn.

### Prima Facie Case

It is undisputed that:

> 1. Haynes, age 57, was within the protected age group.
>
> 2. He was performing according to ARG's legitimate expectations.
>
> 3. He was terminated.

But defendants say Haynes cannot show that others not in the protected class (that is, under 40 years old) were treated more favorably. To support that contention they present evidence that:

> 1. Bastuba and Norton, both under 40, were terminated along with Haynes.
>
> 2. Three of the four employees remaining in Des Plaines were *in* the protected class.
>
> 3. After the termination the average age in the Des Plaines office actually *rose* (from 46.25 to 49.75).

These facts do not really meet head-on the requirement of the prima facie case: Evidence of people under 40 being fired or of other people over 40 being retained does not negate the existence of anyone under 40 being retained (or otherwise more favorably treated). *Smith,* 876 F.2d at 1318 put the fourth factor in terms of whether "others"—not "*all* others"—"not in the protected class were treated more favorably." And

---

than to prove his case by a preponderance of the evidence.

**6.** Both because the *McDonnell Douglas* formulation is so familiar by now and because (as the following text discussion reflects) it has had to be restructured for cases like this one, it will not be repeated here in its initial form.

on that score, all Haynes need do is show that at least one employee under 40 was treated more favorably (see *Nellis*, 695 F.Supp. at 402).

Haynes points to Nix, who was 32 at the time of Haynes' termination and was retained to perform accounting duties in Texas. Defendants reply that Texas is not "in the relevant universe" for this case, because reductions took place only in Des Plaines. But defendants really ask for a "too rigid" application of the burden-shifting analysis (*Smith*, 876 F.2d at 1319). At the threshold step it is enough that Haynes and not Nix was terminated. It was just so in *Smith*, *id.* at 1320, which found that retention of a 25–year–old in an employer's West region satisfied the fourth prong where plaintiff was terminated pursuant to the employer's RIF in its Central region.[7]

### *Pretext*

■ By 1987 ARG had closed all of its facilities except the Texas can centers (and Des Plaines). Because the duties of Haynes, Bastuba and Norton by that time related primarily to the then-defunct facilities, their responsibilities had either disappeared or were greatly reduced, necessitating the ensuing RIF. There is no doubt (and the parties do not dispute) that this details a legitimate nondiscriminatory reason satisfying *McDonnell Douglas*' step 2. On the current motion, then, the burden returns to Haynes to show there is a material factual issue as to whether the stated reason is pretextual.

*Smith*, 876 F.2d at 1319 (citations omitted and quoting *Oxman*, 846 F.2d at 453) describes that burden here:

> The plaintiff must focus on the specific reasons advanced by the defendant to support the discharge.... This may be accomplished by "showing either that a discriminatory reason more likely than not motivated the employer or that the employer's proffered explanation is incredible." ...

Unbelievability may be established by showing either that the employer's reasons (*id.* at 1319):

> 1. have no basis in fact; or
> 2. though they have a factual basis, were not really factors motivating the discharge; or
> 3. were such factors, but were insufficient to motivate the discharge.

Haynes tenders a good deal of evidence on this step, seeking to show that material factual issues remain as to whether a discriminatory reason more likely motivated ARG or whether ARG's proffered reason is incredible. But an examination of that evidence discloses that in probative terms it is all chaff and no wheat.

### 1. *Direct Evidence of Discrimination*

Both Richmond and Evans were involved in the decision to terminate Haynes. Haynes presents statements made by them that he says create a factual issue as to whether discrimination was the likely motivation for terminating him.

> First, Haynes Dep. 95–96 recites this: Mr. Richman [sic] told us of conversations by a Mr. Bond Evans who when he took over general manager—manager position at one of the Alumax plants. Mr. Evans bragged how it was simple and very easy to get rid of employees over 45. And he did get rid of people at such ages. These were Mr. Richman's words, and he made it clear that he made notes of that on the basis that when his time did come around and any such thing occurred with him, he would take the necessary actions to remedy with such actions. He made that clear around the office with just about everybody, he didn't hide talking about those things.... [Richmond] also mentioned that in closing other plants, in closing Alumax plants now, it was not unusual to retire the older people in excess of 55 years of age when he's talking about that.

---

7. Haynes also pointed to the more favorable termination packages of Bastuba and Norton (and Manley, who was 43(!)) and to the retention of Vice-president Mitchell (age 33) as evidence of more favorable treatment. This opinion need not reach those questions, because the Nix situation is enough to move the analysis to the next step.

But that testimony (which must be credited on the present motion [8]) does not place this case in the same category as *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1129 (N.D.Ill.1986), where this Court found:

> If an employer discloses an age-biased or race-biased mindset, it is certainly a permissible inference that the mindset is not focused solely on the individual employee to whom or about whom the specific statement was made.

In *Rizzo* there were numerous incidents of the employer's having commented that certain employees (not plaintiff) were to be terminated because they were too old. That created a legitimate and reasonable inference that the same motivation was at work as to Rizzo. By contrast, Evans' asserted statement (which it must be noted did not express a desire to eliminate employees *because* of their age, though that could be one arguable reading of what was meant) does not reasonably carry the tainted connotation in the context of what happened here. For this purpose it *is* relevant that the Des Plaines RIF involved over–40 and under–40 employees, and there is no evidence that it was any "easier" to "get rid of" Haynes and Manley (who were in the protected age category [9]) than Bastuba and Norton (both of whom were under 40). For this purpose it *is* relevant that three of the four remaining people at Des Plaines post-RIF were in the ADEA-protected group and that the effect of the RIF was to increase the age of the office staff there. For this purpose it *is* also relevant that Richmond expressed his opposition to any termination of over–age–45 employees (on more than one occasion, as the earlier and later quotations in this section reflect), because after all the ultimate decision was made by Richmond *and* Evans jointly.

In sum, Haynes offers no evidence from which an inference can be drawn that Evans' RIF decisions affecting the Des Plaines staff reflected an intention to discriminate against *anyone* (let alone Haynes) on the basis of age. Although Haynes need not link discrimination-suggestive statements directly to his termination, he must offer enough to support a reasonable inference that the impermissible intent was in operation in his case. That was required in every case the parties cite in this area (*Rizzo; Oxman*, 846 F.2d at 457, *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 94 (7th Cir.1985) (cited in *Rizzo* )), and it is lacking here.

Second, Haynes says on several occasions he overheard Richmond's statements of his desire to "get rid of" Haynes. But Haynes cannot of course cite any authority to support the proposition that abstract desire to terminate an employee for no articulated reason is indicative of age-based discrimination. And Richmond himself had expressed to Haynes his opposition to termination of over–45 employees (in that respect Mitchell Dep. at 123 also confirms that Richmond "did not like the termination of long-term employees"). Moreover, ADEA is not a charter to assure good employer-employee relationships or even merits-based or logically-grounded employment decisions. It is not a blunderbuss aimed at employer animus in general, but a rifle aimed at age-based animus. In short,

---

**8.** Under Rule 56(e) the evidence to be considered "shall set forth such facts as would be admissible in evidence" (though that quotation speaks of the content of affidavits tendered in conjunction with the motion, the same standard of course applies to deposition testimony tendered to the court). Here Haynes offers an out-of-court statement by Richmond as to what he had heard Evans say out of court, and he offers it for the truth of Richmond's statement—a purpose within the Fed.R.Evid. 801(c) definition of hearsay. But it appears that the Richmond statement, like the second statement Haynes also attributes to Richmond, fits the non-hearsay criterion of Fed.R.Evid. 801(d)(2)(D) and is hence admissible.

**9.** Though it is a mistake to cut things too fine in this area, where summary judgment and not the weighing of evidence is involved, it bears at least brief mention that the statement ascribed to Evans was in terms of age 45 rather than the ADEA dividing line of age 40. In the former terms, three (not two) of the four employees terminated at Des Plaines fell outside the category Evans assertedly described as "easy to get rid of." Again it becomes an impermissible strain on the language to ascribe the Des Plaines RIF of Haynes (the only one out of the four who was over 45) to an age-based motive.

Richmond's statements are irrelevant to Haynes' claim.

## 2. *Mitchell's "Master Plan"*

Haynes offers up this scenario:[10] Sometime before 1984 Mitchell (presumably with Evans) hatched a plan to axe Haynes because he was too old. To accomplish that Mitchell created an accountant's position in Texas and transferred a young Nix to fill the position. Apparently having the foresight to know that by 1987 the Texas can centers would be the only facilities owned by ARG, Mitchell began "secretly" shifting the can center responsibilities from Haynes to Nix. Thus when Cleveland and Bicknell were sold (assertedly no surprise to Mitchell, who had the crystal ball to have anticipated that by some years), it was made to appear as if out of the blue that Haynes was no longer needed, so he could be and was terminated. Once Haynes was safely out of the picture, Mitchell administered the coup de grace of his master plan: Nix gave up the sham accounting position to work full time on her real duties, scrap buying. That in turn cleared the way for Mitchell to fulfill his sub rosa three-year objective: to lure a 27–year–old male (Doug Drerup) to do the accountancy work. Having done his dirty deed, Mitchell promptly announced that he was leaving ARG and went to sell ice cream and knick-knacks in Wisconsin.

All Haynes has shown is that it is possible to devise almost any story post hoc to mix facts with total fancy. As a proposed solution to a connect-the-dots puzzle, the lines it seeks to draw between the factual dots are the random paths of wild improbabilities rather than the straight lines of reasonable inferences. Moreover, Haynes' version conveniently ignores a number of the factual dots—such undisputed facts (to name only a few) as these:

1. ARG's decisions to sell Cleveland and Bicknell were not made until 1986.

2. Haynes knew that his responsibilities were being shifted—that was no secret.

3. It had always been intended that Nix do both scrap buying and accounting.

Haynes' revisionist "history" may profitably be contrasted with defendants' version of events: In early 1984 Mitchell decided to make the Texas can centers more independent and autonomous. To accomplish that he hired Nix from an Alumax subsidiary, then began training her and transferring duties according to plan. When—over two years later—Cleveland and Bicknell closed, there was no longer enough for Haynes to do, and he was terminated. Still later, when the aluminum business picked up again, Nix had to spend more time on her scrap buying duties, so Drerup was hired to take over the accounting.

This is not at all a matter of comparative credibility—of the weighing of evidence, as a court should not essay in the milieu of summary judgment motions. Instead this Court must simply bear in mind the three *Smith*-cited ways to find unbelievability, together with the oft-taught maxim (*Smith*, 876 F.2d at 1321) (citation omitted):

> At any rate, it is not our purpose to second-guess an employer's good faith business decision.

*Smith, id.* (citations omitted) then goes on to quote *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988):

> [W]e do "not sit as a super-personnel department that reexamines an entity's business decisions." ... "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere." ... Rather, our inquiry is limited to "whether the employer gave an honest explanation of its behavior."

ARG's explanation surely has a solid basis in fact: Its desire to make the can centers autonomous certainly jibes with the autonomy of all other ARG facilities. And once Cleveland and Bicknell were closed, there clearly was not enough accounting work to do: With both full-time accountants (Bastuba and Haynes) having been

---

10. Because of the convoluted nature of Haynes' hypothesis-upon-a-hypothesis-upon-a-hypothesis (and so on) presentation, this Court's own per-

sonal animus—one against run-on paragraphs—has had to be suppressed in what follows in the text.

terminated, Mitchell currently performs all the residual accountant work plus other duties on a part-time schedule of only *four* days each month! Additionally, the contraction of activities reflected in the terminations of which Haynes was a part continued into the further RIF that resulted in Mitchell's departure at the beginning of this year. Haynes cannot dispute the factual basis of ARG's explanation.

Nor does he create a genuine factual issue as to whether ARG's stated reasons were the real and sufficient factors motivating his discharge. Decisions to transfer duties and to reduce work forces are particularly within the sound business judgment of the employer (*Smith, id.*). Thus Haynes has not established a rational factual issue suggesting that defendants' proffered explanation is a mere pretext for Mitchell's "master plan"—a theory advanced on less than meager evidence and totally wild speculation.

Haynes argues, however, that it is highly suspicious that defendants transferred Nix to Texas in the first instance, rather than Haynes with all his experience. Although ARG advances good arguments in response (for example, if Haynes had been transferred they would have had to hire someone new in Des Plaines), it need not do so—for Haynes would impermissibly have this Court decide what was the sensible or even the efficient thing for ARG to do. This Court cannot substitute its business judgment for ARG's. Relatedly, as *Smith, id.* at 1322 quotes from *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1217 (7th Cir. 1985):

> The ADEA was not intended to legislate seniority rights where none exist in the contract of employment.

Another Haynes argument—that the transfer of Haynes' accounting duties and not Bastuba's is similarly suspicious—suffers from the same fatal flaw. Besides, Haynes blithely ignores the fact that Bastuba was terminated *anyway!*

Haynes Mem. 6 also contends defendants' creation of the new position for the younger Nix is evidence of pretext, citing to that end this Court's opinion in *Zick v. Verson Allsteel Press Co.*, 644 F.Supp. 906, 913 (N.D.Ill.1986) (later *aff'd*, 819 F.2d 1143 (7th Cir.1987) (unpublished opinion)). But *Zick* states no such proposition. ARG created a new job according to its valid (that is, non-tainted in ADEA terms) plans, and it hired a qualified employee. Haynes cannot label that as evidence of discrimination.

*Zick* also defeats Haynes' final argument on his "master plan" theory—that ARG routinely transferred its employees, and that its refusal to transfer him is evidence of pretext. It teaches (*id.*):

> But the fact an employer fails to find some way of retaining an older employee, even at the expense of firing a younger one, is not evidence of a discriminatory motive.

See also *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 942 n. 6 (6th Cir.1987) (finding no ADEA duty for an employer to transfer an employee during an RIF), cited favorably in *Smith*, 876 F.2d at 1322. In this case, Haynes cannot even come up with evidence that ARG or Alumax had any sort of policy to transfer employees *routinely*,[11] or that there were any available positions at the time of the RIF. Even if Haynes could have transferred, defendants had no obligation to offer a transfer, nor did they discriminate by failing to offer Nix's job to Haynes in 1988 (after he had left).

### 3. *Termination Benefits*

Haynes finally urges that Manley, Norton and Bastuba received preferential treatment in their termination benefits, and that ARG's tendered explanation is pretextual. Again his position must be found wanting:

1. Manley was 43 upon termination, so his benefits are truly irrelevant.

2. Haynes claims Norton was never terminated—but if that is true, it also follows that Haynes cannot reasonably be compared to him in terms of benefits.

3. Bastuba was allowed to leave before April 30, 1987 and to receive his $2,000 bonus. Haynes claims that was

---

**11.** Haynes submits only evidence that Alumax transferred Nix and a "few" others, and that ARG transferred Mitchell. That does not establish a material factual issue as to the existence of routine.

preferential. However, Bastuba left early to start a new job, while Haynes' new job did not begin until June 1, 1987. There is nothing to suggest that Haynes would have been treated differently from Bastuba if he too had found an earlier-starting job. In sum, Haynes' arguments here also do not demonstrate that any disparate treatment occurred.[12]

### Conclusion

Haynes has been unable to demonstrate in any way that any material issue of fact remains as to whether ARG's articulated reason for terminating Haynes was legitimate and nondiscriminatory. Thus he has failed to carry his burden at *McDonnell Douglas'* step 3 on defendants' summary judgment motion.

Although Haynes has passed the easy first-stage requirement of posing a prima facie case, his failure to demonstrate a genuine issue of material fact at step 3 dooms his case. Defendants are entitled to a judgment as a matter of law, and this action is dismissed.

---

**12.** Haynes also argues that the reduction of his benefits from two weeks to one week per year is discriminatory. But that reduction was undisputedly done pursuant to a company-wide policy change, and it was applied evenhandedly (at least as a starting point). Even if Haynes were somehow viewed as having been injured by that action, ADEA is not implicated.