**Frederick P. GODFREDSON, Plaintiff,**

v.

**HESS & CLARK, INC., Defendant.**

No. 1:96–CV–2662.

United States District Court,
N.D. Ohio,
Eastern Division.

March 3, 1998.

■■■■■■■■■■■■■

Grant A. Wolfe, Matan, Geer & Wright, Columbus, OH, for Plaintiff.

James E. Davidson, Daniel W. Srsic, Schottenstein, Zox & Dunn, Columbus, OH, for Defendant.

## MEMORANDUM DECISION

GWIN, District Judge.

On November 3, 1997, defendant Hess & Clark, Inc. filed a motion for summary judgment in this age discrimination in employment case [Doc. 17]. The defendant says Plaintiff Frederick Godfredson cannot make out a *prima facie* case of age discrimination. The defendant says it discharged Godfredson as part of a reduction in force and because the company's pet food line was failing. The defendant also argues that there is no genuine issue regarding Godfredson's state law causes of action.

For the reasons that follow, the Court grants judgment to the defendant.

### I

On July 28, 1995, Defendant Hess & Clark fired the Plaintiff Frederick P. Godfredson, then 59 years old, along with 18 other employees as part of a reorganization and reduction in force. On December 11, 1996, Godfredson filed this lawsuit seeking money damage under the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. § 621 *et seq.* He also seeks relief under three state law claims, and has asked for attorney's fees. The plaintiff alleges in his state common law causes of action: intentional infliction of emotional distress, promissory estoppel, and wrongful discharge violating Ohio's public policy against age discrimination.

Defendant Hess & Clark employed Godfredson in August 1990 when it purchased a company called Veratec. At the time it purchased Veratec, Hess & Clark offered employment to some Veratec employees. To join Hess & Clark, these employees needed to move from Boston, Massachusetts, to Ashland, Ohio. Godfredson and Bruce Perry were the only Veratec management people hired.

Hess & Clark confirmed the terms of Godfredson's employment in a July 12, 1990, letter. This letter recited Godfredson's proposed salary, benefits, pension plan, vacation policy, 401(k) plan, and severance pay. On August 3, 1990, Godfredson approved and executed the letter agreement. On August 11, 1990, Godfredson also signed a document entitled "Employee Agreement" and again on May 2, 1991. Both described his employment as at will.

Godfredson claims an understanding with Bruce Bookmyer, the defendant's president, that if he moved to Ohio, Defendant Hess & Clark would give him a job for 10 years until he reached retirement age. Godfredson's claimed oral employment contract arose out of merger discussions in the summer of 1990 as Bookmyer and the plaintiff discussed the transfer of personnel and assets from Veratec to Hess & Clark. Godfredson says this oral understanding with Bookmyer was central to his decision to work for the defendant.

Initially, Hess & Clark gave Godfredson marketing responsibility for both KenAg and KenVet. The KenAg business consisted of the milk filtration and agricultural pharmaceuticals business, while KenVet focused on the sale of surgical dressings to veterinarians. In May 1992, they made Godfredson director of marketing for KenVet. The KenAg and Hess & Clark businesses were consolidated under Bookmyer and Director of Marketing Bruce Perry.

In September 1992, Godfredson began developing a pet food business called KenVet Nutritional Care. Godfredson solicited company support for this project with I estimates that this pet food business could achieve approximately $100 million in annual sales. The pet food was to be a high end diet for dogs and cats available only through veterinarians.

Once underway, Godfredson spent 60 percent of his time on KenVet Nutritional Care, while the balance of his time was directed toward the KenVet "white goods" or surgical dressings business. According to some witnesses, Godfredson spent less than 20 per-

cent of his time on the "white goods" business.

Ultimately, Hess & Clark decided to eliminate the pet food business, which had I done only a fraction of the projected sales. On July 23, 1995, Bookmyer and Jeff Moorman, the director of operations at Hess & Clark, told Godfredson that the poor performance of the pet food business, and the decision to eliminate that business, were the reasons for his firing.

Though he never discussed the matter with Bookmyer, Godfredson testified that he believed that if Hess & Clark ever left the pet food business, he would continue to manage the wound care business on a full time basis. However, the defendant says Hess & Clark had never employed Godfredson to run only the wound care business. Defendant Hess & Clark says this wound care business did not have sufficient sales volume to justify having a full-time director of marketing. When it combined the KenAg business line with Hess & Clark products in 1992, the defendant says Godfredson was relieved of approximately two-thirds of his marketing responsibilities. Making the plaintiff responsible for the new pet food business covered that shift.

On July 23, 1995, Bookmyer and Moorman met with Godfredson and presented the plaintiff with a separation package. During the discussion, Godfredson asked why they were terminating him. They informed him that it was because of the failure of the pet food business.

With his termination, Hess & Clark gave Godfredson a letter stating that he would receive $10,943 for his 36 1/2 days of unused vacation, and $8,994 in severance pay. Hess & Clark paid Godfredson this money. Hess & Clark also offered Godfredson an additional $8,994 in exchange for a release of any potential claims against the defendant. Godfredson declined this offer.

Once Hess & Clark decided to end the pet food business, it restructured KenVet and instituted a reduction in force. At the time Hess & Clark terminated Godfredson, it also terminated 18 other employees, ten of whom were less than 40 years of age. After the reduction in force, the remaining sales people sold only "white goods."

On August 18, 1995, Godfredson filed a charge of age discrimination with the Ohio Civil Rights Commission ("OCRC"). In this charge, Godfredson alleged that Hess & Clark discriminated against him because of how much severance pay the defendant offered. Godfredson contended that Hess & Clark offered him only three months of severance pay, while two employees fired before were offered six months of severance pay.

## II

Review of summary judgment motions is controlled by Fed.R.Civ.P. 56(c), which provides in part that

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is not proper if there is a material dispute over the facts, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit has recognized that *Liberty Lobby, Celotex* and *Matsushita* effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford &*

*Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). In responding to a proper motion for summary judgment, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* at 1479 (quoting *Liberty Lobby,* 477 U.S. at 257.) The nonmoving party must introduce more than a scintilla of evidence to overcome the summary judgment motion. *Street,* 886 F.2d at 1479. It is also not sufficient for the nonmoving party merely to "show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street,* 886 F.2d at 1479. That is, the nonmoving party has an affirmative duty to direct the court's attention to specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

### III

▪ Under the ADEA it is unlawful for an employer to discharge or fail to hire any individual 40 years of age and older or otherwise discriminate against that person with respect to compensation, terms, conditions, or privileges of employment "because of such individual's age." 29 U.S.C. § 623(a). Under Sixth Circuit precedent in reduction-in-force cases, an employer can violate the ADEA when it prefers a younger employee, even if that younger employee is within the protected class of workers aged 40 and over. *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1466 (6th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990).

Here, the plaintiff gives no direct evidence of age discrimination.[1] Having no direct evidence of discrimination, the plaintiff must make the showing described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176,

1180 (6th Cir.1983) (courts should allocate burden of proof in ADEA case according to *McDonnell Douglas–Burdine* analysis Supreme Court adopted for Title VII cases).

In *Kline v. Tennessee Valley Auth.,* 128 F.3d 337 (6th Cir.1997), the Sixth Circuit described the showing required under *McDonnell Douglas:*

> When a plaintiff attempts to establish its case using the *McDonnell Douglas–Burdine* paradigm, the evidence which establishes the *prima facie* case is extremely important. In order to prove a *prima facie* case of discrimination, a plaintiff must show: 1) that he is a member of a protected group, 2) that he was subject to an adverse employment decision, 3) that he was qualified for the position, and 4) that he was replaced by a person outside of the protected class.

*Kline,* 128 F.3d at 349 (citations omitted).

The *McDonnell Douglas* framework consists of three stages. At the first stage, the plaintiff must establish a *prima facie* case that the employer discriminated against him. Second, the employer can produce evidence of a legitimate, nondiscriminatory reason for its action. Finally, the plaintiff attempts to discredit the employer by proving that the employer's reason was a pretext for discrimination. *Id.* at 342.

A *prima facie* case requires the employer to go forward with evidence of a nondiscriminatory intent. The *prima facie* case creates a presumption that discrimination was the real motive for the employment action. In *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) the Court explained this:

> [W]e are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been elimi-

---

1. The *McDonnell Douglas* formula is inapplicable, however, to cases in which the Title VII or discrimination plaintiff presents credible, direct evidence of discriminatory animus. See *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111,

121, 105 S.Ct. 613, 83 L.Ed.2d 523, (1985); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985), *cert denied,* 490 U.S. 1064, 109 S.Ct. 2062, 104 L.Ed.2d 627 (1989).

nated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race. 438 U.S. at 577.

■ Since the *prima facie* case creates a presumption of discrimination, if the employer fails to respond to the *prima facie* case and if the trier of fact believes the plaintiff's *prima facie* evidence, then the plaintiff will receive judgment. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Disbelief of the defendant's proffered reasons does not compel a court to enter judgment for the plaintiff. *Id.; Kline,* 128 F.3d at 343–44, 347 ("will permit" a finding of discrimination) (*Hicks* adopts "permissive pretext" approach rather than Sixth Circuit's "pretext plus" approach to earlier employment discrimination analysis). Only the burden of production shifts to the employer; at no time does the defendant need to persuade the trier of fact that "it was actually motivated by the proffered reasons."[2]

The plaintiff here always carries the burden of persuasion. *Hicks,* 509 U.S. at 511. The burden of production shifts back to the plaintiff, if the defendant proffered reasons, and the plaintiff must persuade the trier of fact that the employer's articulated reasons are a "pretext." *Kline,* 128 F.3d at 342. Any presumption generated by the *prima facie* case drops out of the case. *Hicks,* 509 U.S. at 510–11.

■ To prove that defendants's reasons are pretextual, the plaintiff must show that the reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the defendant's decision, that they were jointly insufficient to motivate the discharge. *Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 266 (6th Cir.1986) (showing pretext in age discrimination suit), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987).

■ When age discrimination in the employment context arises out of a work force reduction, the plaintiff who shows (1) he was 40 or older, (2) was qualified to do his job, and (3) was discharged does not establish a *prima facie* case without more direct, circumstantial, or statistical evidence tending to show that the employer singled out that plaintiff for discharge for impermissible reasons. *Barnes,* 896 F.2d at 1465. This is so even if the plaintiff can show that the employer retained younger persons in other jobs that the plaintiff was qualified to do. *Id.* Otherwise, anyone over 40 discharged during a reduction in force could establish a *prima facie* case of age discrimination. *Id.* This "extra" evidence has to be "sufficiently probative" to permit the finder of fact to believe that the defendant intentionally discriminated against the worker due to age. *Id.* at 1466.

IV

The parties agree that the plaintiff meets the first two requirements for establishing a *prima facie* case of age discrimination. As Godfredson was 59 years old at the time of his discharge in July 1995, he was a member of the group protected under the ADEA. Defendant Hess & Clark subjected Godfredson to an adverse employment decision.

The parties disagree over whether the plaintiff was qualified for his position, whether a person outside the protected class replaced Godfredson, and whether the Court should analyze this case under a reduction-in-force analysis.

The plaintiff submits that the threshold issue is whether this is a reduction in force case at all. *Barnes* held that:

A work force reduction occurs when business considerations cause an employer to eliminate one or more positions within the Company. An employee is not eliminated as part of a work force reduction when he

---

**2.** *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

or she is replaced after his or her discharge.

*Id.* at 1465.

■ One has not been replaced when an employer assigns another employee to do the plaintiff's duties in addition to other duties, or when the employer redistributes the work among other existing employees already doing related work. *Id.*[3] In other words, a worker cannot say the employer replaced him when his boss assigned someone else to do the same tasks in addition to that person's other duties or redistributed the worker's tasks among co-workers who already did similar labors. *Id.* The Sixth Circuit considers the position of a worker not "replaced" as "eliminated," thus triggering a reduction in force analysis and a further evidentiary burden on the plaintiff.

■ Plaintiff Godfredson argues Hess & Clark did not discharge him as part of a reduction in force, claiming it replaced him. In opposition, Defendant Hess & Clark says it did not hire anyone to replace the plaintiff and assigned Jeff Moorman, David Housewright and Bruce Bookmyer to do Godfredson's duties in addition to their other tasks.

Hess & Clark eliminated 18 positions beyond Godfredson's. Hess & Clark eliminated these employees on July 28, 1995, or on August 1, 1995.

The Court finds that Hess & Clark laid Godfredson off in the midst of a reduction in force. As a result, the Court should analyze his age discrimination case under the stricter standard applicable to such reductions. Defendant Hess & Clark eliminated his position due to business considerations. Defendant Hess & Clark did not replace Godfredson because Hess & Clark redistributed his work among existing employees: Bookmyer and Moorman for the KenVet Nurtritional Care duties and between Moorman and Housewright for the plaintiff's duties related to the "white goods" product line.

As the Court finds this is a reduction in force age discrimination case, Godfredson must come forward with additional probative evidence that Hess & Clark intentionally discriminated against the plaintiff based on age as part of his *prima facie* case. The plaintiff has failed to produce such additional evidence of age discrimination.

■ To show a *prima facie* case of age discrimination, Plaintiff Godfredson must show that he was qualified for his position. "In order to show that he was qualified, [plaintiff] must prove that he was performing his job 'at a level which met his employer's legitimate expectations.'" *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990) (*citing Huhn v. Koehring Co.,* 718 F.2d 239, 243 (7th Cir.1983)). The defendant says that Godfredson cannot satisfy this burden because he was primarily responsible for managing and marketing the KenVet Nutritional Care pet food business that lost more than $ 10 million before the defendant sold or transferred the pet food line to another subsidiary of the parent corporation.[4] A reasonable juror could find Godfredson was not meeting the defendant company's legitimate expectation that he would operate *this business* successfully. *Id.* at 1160. Yet, Plaintiff Godfredson had worked for Defendant Hess

---

**3.** *Barnes* has been called into question recently. The Sixth Circuit has held that the promotion of another from part-time to full-time status is the same as being "effectively replaced." *Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 522 (6th Cir.1997). The parties' submissions have not shown an "effective replacement" of Godfredson's duties by either Bruce Bookmyer, Jeff Moorman, and/or David Housewright.

**4.** In his capacity as director of marketing for the KenVet division, it was Godfredson's responsibility to forecast actual sales volumes, and profit and loss for the Ken Vet Nutritional Care business. Bookmyer submitted an affidavit that states that Godfredson projected in 1992 that if Hess & Clark invested in the business, KenVet Nutritional Care would achieve sales exceeding $8.1 million, $18.6 million, and $33.2 million during the first three years of operation. The actual sales for those three years were approximately $700,000, $1.2 million, and $600,000 (for the first five months of the third year). During that time, the actual losses for the business were $950,000, $8.2 million, and $1.4 million (again for the first five months of the third year) respectively. Godfredson had predicted profits in the first year of $1 million, $4.3 million in the second year, and $7.6 million in the third year. Godfredson says the $10 million loss was not all his fault. Godfredson gives evidence of certain problems associated with starting the pet food line.

& Clark for years with success. Despite his failure with the KenVet Nutritional Care business, a reasonable juror could find Godfredson qualified.

The plaintiff also has difficulty establishing the fourth prong of his *prima facie* case and showing whether a person outside the protected class replaced him. Godfredson alleges that David Housewright replaced him. Housewright was the national sales manager for KenVet at the time of the reduction in force. By August of 1995, Housewright had sold the KenVet product line for eight years and had been employed at Hess & Clark for five years.[5] As sales manager, Housewright's duties included directing the sales force. Housewright continued to do the national sales manager duties he had done before Godfredson's termination. Because Housewright did work related to that done by Godfredson, even if Hess & Clark had redistributed any of plaintiff's duties to Housewright, it would not be a "replacement" as defined by the Sixth Circuit.

Once Hess & Clark commenced the KenVet Nutritional Care business, Godfredson devoted approximately 60 percent of his time to it. After Hess & Clark eliminated his position, it neither retained nor hired anyone to become director of marketing for the KenVet Nutritional Care business.[6] Even if the plaintiff could raise a material issue of fact with respect to the reassignment of Godfredson's "white goods" duties, Hess & Clark eliminated 60 percent of his job.

Reasonable fact finders could not find that the plaintiff had satisfied the fourth prong of his *prima facie* case.

Even if the plaintiff has met the usual four-part test to make out his *prima facie* case, this age discrimination case involves a reduction in force. Plaintiff Godfredson must come forward with some additional probative evidence of discrimination.

To make this showing, Godfredson alleges that Hess & Clark offered plaintiff less favorable severance pay than it had previously paid or offered to younger employees with less time in service.[7] Godfredson alleges discrimination because Hess & Clark offered him three months of severance pay, while two previously fired employees, Trulove and Hemjem, were offered six months of severance. However, Hess & Clark fired Hemjem and Trulove in 1991, four years before Godfredson. Had Godfredson been terminated then, he would have received 24 months of severance pay under the terms of his letter agreement.[8] Godfredson concedes that the 18 individuals fired along with him in the 1995 reduction in force received either the same package he did or less. Defendant Hess & Clark's severance payment to Godfredson makes no additional showing of age discrimination required by *Barnes*.

Plaintiff claims Bookmyer promised Godfredson he could work for ten years so that Godfredson could retire at age 65. But, the evidence Plaintiff Godfredson cites does not

---

**5.** The record does not show Housewright's age. He graduated from college in 1981, but that does not mean he was younger than 40 years old in 1995. Counsel also do not show that Moorman was 44 years of age during the summer of 1995. This lack of evidence militates toward a finding that Godfredson cannot satisfy the fourth prong of his *prima facie* case. The ages of Bookmyer, Housewright and Moorman could have helped this Court in its analysis. *See Haynes v. Alumax Recycling Group, Inc.,* 719 F.Supp. 707 (N.D.Ill. 1989) (employee fired during a reduction in force only had to prove that one person under 40 was treated more favorably to establish final prong of *prima facie* case).

**6.** Bookmyer made the director of marketing a further responsibility of his job as president of the company.

**7.** Upon being terminated, Defendant Hess & Clark gave Godfredson $10,943 for his 36 1/2

days of unused vacation, plus $8,994 in severance pay. Godfredson also was offered an additional $8,994 in exchange for a release of any potential claims against the defendant. Godfredson declined this offer and did not receive the additional severance money.

**8.** As to Plaintiff Godfredson's agreement with Defendant Hess & Clark regarding severance pay, the July 12, 1990 letter stated:

If during the first twenty-four months of employment by Hess & Clark, Inc. you are involuntarily terminated by Hess & Clark, Inc. for reason(s) other than misconduct you will receive one full year regular salary. This letter is not a contract of employment for a definite duration, and your employment continues at-will and may be terminated with or without cause at any time.

support·the inference he seeks.[9] Moreover, Godfredson admits he then signed more than one document describing his employment as at will. No evidence shows either Godfredson's firing or the reduction in force were designed to eliminate older employees.

■ The Sixth Circuit holds that an employer has no duty to transfer an employee to another position within the company when the employer reduces his work force for economic reasons. *Ridenour v. Lawson Co. .,* 791 F.2d 52 (6th Cir.1986). Defendant Hess & Clark had no obligation to transfer Godfredson to another position.

Godfredson fails to show the additional evidence of age discrimination required in reduction in force cases. Summary judgment in favor of Hess & Clark on the plaintiff's ADEA claim is appropriate here.

■ Even if Plaintiff Godfredson had made out a *prima facie* case, which he has not, he does not show that defendant's business rationale was a pretext.[10]

9. In his deposition, Godfredson testified about the oral employment contract in this colloquy:

Q. So you were encouraged to assist Hess & Clark in the transition?
A. Oh, yes. Financially, yes.
Q. What were the factors that caused you to go with Hess & Clark as opposed to seeking other opportunities?
A. There were two factors: Number one was, first of all, I understood the business and the industry totally a lot better than I would have at some of the others because I've been in the industry so long.
The other was I sat down and discussed with Bruce Bookmyer—I said, Bruce, I have one problem that I'm facing. I said, I'm 55 years old and I want to be able to retire with the company. I don't want to get put in a position where I'm going to—two years down the road you're going to pick my brains and then say bye-bye because—and at that time we had a discussion, and as I remember it, Mr. Bookmyer says, I see no problem with you retiring at Hess & Clark.
Q. Did Mr. Bookmyer ever guarantee that your employment would continue for a specified period of time?
A. Verbally. I mean, when we talked about it, he said, I see no problem, you should be able to work with Hess & Clark for the next ten years.
Q. The said ten years?
A. Well, that was what the discussion was at that time, because I was 55 years of age and I told him I wanted to make it to retirement at 65, and I expressed to him that in the retirement benefits programs, you know, 15 plus 15 doesn't equal 30 in retirement programs because it's just the way they're structured.
Q. What—other than what you've already told us, what did Bruce say to you that made you think that your job would last until you reached the age of 65?
A. His commitment towards developing the business and making it grow, that this was a major acquisition for Hess & Clark, and that this was what they were looking for to become better established in the agricultural veterinary market.

Q. Anything else that he said to you that made you think that your job would last until you reached the age of 65?
A. Part of the negotiations that we—well, as an adjunct to that, we—they did offer us that if we were terminated during the first two years of employment we would get a full year's salary severance. That helped to say, hey, we're moving towards building a good business here.
Q. That was communicated to you in a letter—
A. Yes.
Q.—that Bruce signed?
A. don't have it. I'm sorry.
Q. Was there anything else that you remember that was in writing that told you about how long this job would last or what it would consist of?
A. No.
Q. Have you told me everything that you can remember that Bruce said to you that made you think that this job would last until you were 65?
A. I guess the other thing was that we negotiated things such as health insurance, you know, taking off the condition of no preexisting conditions for all the people that were going with me. It was just a lot of negotiations that were going on concerning the transfer, concerning personnel, concerning products and everything else that led me to believe that this was going to be a long-term commitment.
Q. And by long-term, it was your view that it would be ten years?
A. At least.
Q. And you recall telling him specifically that you wanted to stick with the job until you were 65?
A. Yes.
Q. And what do you remember him saying in response to that?
A. He said—his response that I remember was, I see no problem.
(Depo. at 43–47).

10. The plaintiff cites a decision by the Eighth Circuit Court of Appeals where a panel found a discharged 60–year–old showed that a reduction in force was a pretext for his dismissal. *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct.

Principally, Godfredson depends on the fact that he was the only employee paid out of the wound care/white goods business, who lost his job upon the closing down of the pet food business. He argues this suggest Hess & Clark singled him out for discharge. But this does not support the inference claimed.

■ The Court finds that the defendant's explanation of a reduction in force caused by a $10 million loss in the pet food product line is credible, has a basis in fact and is the actual factor motivating the discharge. *See Chappell*, 803 F.2d at 266; *Kesselring v. United Technologies Corp.*, 753 F.Supp. 1359 (S.D.Ohio 1991) (evidence insufficient to establish 66–year–old employee was terminated due to his age rather than a reduction in force as employee's sales region had been eliminated and he was not replaced). The ADEA does not grant authority to judge the wisdom of a corporation's business decisions. *Parcinski v. Outlet Co.*, 673 F.2d 34, 36 (2d Cir.1982) (63–year–old discharged after another company decided to buy plaintiff's employer and eliminated employer's buying and merchandising staff of which plaintiff was a member was not the victim of age discrimination where evidence showed decision to eliminate buying staff was made before any consideration of buyers' ages).

Hess & Clark fired Godfredson because the plaintiff was director of marketing for a project that lost more than $10 million in less than three years. Eighteen employees besides the plaintiff also lost their jobs. Godfredson lacks evidence that age played a role in this decision. More than one-half of the employees discharged during the summer of 1995 were less than 40 years old.

Accordingly, the Court will grant the defendant's motion for summary judgment on the plaintiff's ADEA claim. Courts have recognized a defendant is entitled to summary judgment when the only inference of age discrimination must be found in speculation and conjecture. *Langston v. Carraway Methodist Hospitals of Alabama, Inc.*, 840 F.Supp. 854, 867 (N.D.Ala.1993) (fact plaintiffs were second oldest and oldest employees

in their department unimportant with fact they were department heads in departments eliminated during reorganization and their duties and job functions were dispersed throughout the new departments and allocated to several persons).

V

■ Though Godfredson has chosen not to pursue an age discrimination claim under the Ohio Revised Code, he alleges a common law cause of action for a violation of the public policy against age discrimination in employment. The evolving law of public policy torts in Ohio was most recently clarified by the Ohio Supreme Court in *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 677 N.E.2d 308 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). The court held that an employee discharged for filing a complaint with OSHA may maintain a separate public policy tort action even if he did not comply with the Ohio Whistleblower Act. *Id.* at 162, 677 N.E.2d 308. However, to establish a public policy tort, plaintiff Godfredson must show the same facts required to prove the underlying statutory violation of the ADEA.

■ Since Hess & Clark is entitled to summary judgment on plaintiff's ADEA claim, he cannot prove a public policy tort. The public policy against age discrimination is not at issue unless age discrimination occurs. One of the "Perritt factors" for the tort of wrongful discharge violating public policy includes the employer's lack of an overriding legitimate business justification for the dismissal. *Id.* at 151, 677 N.E.2d 308. The Court finds that the defendant's reduction in force defense to the ADEA claim provides such a business justification. Therefore, Hess & Clark is entitled to summary judgment with respect to the plaintiff's public policy tort claim.

VI

■ Besides his allegation of age discrimination, Godfredson asserts a claim

782, 102 L.Ed.2d 774 (1989). However, the *Hillebrand* court noted that the plaintiff had established a *prima facie* case of age discrimination.

Moreover, the facts in *Hillebrand* are distinguishable.

based upon the common law theory of promissory estoppel. The Ohio Supreme Court, with few exceptions, states that employment is "at-will." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). The Supreme Court of Ohio has recognized certain limited exceptions to this general rule. In appropriate circumstances, the doctrine of promissory estoppel can alter the at will nature of an employment contract. The courts in Ohio apply promissory estoppel "when a promise which the employer should reasonably expect to induce action or forbearance on the part of the employee does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise." *Id.* at 104, 483 N.E.2d 150.

■ A separated employee can make a claim under promissory estoppel, only if he proves his employer made a discrete promise relating to job security. *See Wing v. Anchor Media, Ltd.*, 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991) (syllabus at 2) ("[A] promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the employment-at-will doctrine."); *Kasuri v. St. Elizabeth Hosp. Med. Ctr.*, 897 F.2d 845, 852 (6th Cir.1990) (deciding that Ohio promissory estoppel law requires a representation to be clear and unambiguous in its terms).

Plaintiff Godfredson shows no clear or unambiguous evidence of a specific promise of future employment. At best, plaintiff relies upon a purported statement by Bookmyer: "I see no problem with you retiring at Hess & Clark." This is not sufficient to raise material issues to support a cause of action for breach of contract founded on promissory estoppel.[11]

Given the indefinite nature of Bookmyer's representations and given Godfredson's express written agreement to employment-at-will, defendant should receive judgment on plaintiff's promissory estoppel claim. The Court gives defendant judgment on this state law claim.

## VII

■ In *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983), the Ohio Supreme Court adopted Section 46 of the Restatement of the Law 2d, Torts (1965), in recognizing a claim for intentional infliction of emotional distress. The Court described the tort as follows:

One who by *extreme and outrageous conduct* intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. *Id.* (syllabus of decision) (emphasis added).

The *Yeager* Court cited a comment to the Restatement which noted that "outrageous" and "extreme" confined liability to conduct going "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 375, 453 N.E.2d 666. The Court does not find that standard met here.

In the complaint and in his brief opposing this motion, Godfredson relies upon the facts set out to support his other causes of action as the basis for his intentional infliction of emotional distress claim. These allegations are legally insufficient to meet the require-

---

11. In *Mers*, the Court described this:

Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages. The same is true where the contract of hiring specifies no term of duration but fixes compensation at a certain amount per day, week, or month. Although not absolute, the above stated rule appears to be in the nature of a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other. The presumption is grounded on a policy that it would otherwise be unreasonable for a man to bind himself permanently to a position, thus eliminating the possibility of later improving that position. Moreover, a contract of permanent employment is by its very nature indefinite, and thus any effort to interpret the duration of the contract and assess the amount of damages becomes difficult.
*Mers* 19 Ohio St.3d at 102 n. 1, 483 N.E.2d 150 (citations omitted).

ments of this claim. Godfredson says that being fired for age discrimination the facts set out to support his other causes of action as the basis for his intentional infliction of emotional distress claim. These allegations are legally insufficient to meet the requirements of this claim. Godfredson says that being fired for age discrimination is *by that very fact* a valid claim of emotional distress. Such is not the law in this jurisdiction. The conduct the plaintiff complains of is not outrageous conduct under Ohio law. This state law claim must, therefore, be dismissed.

## VIII

The Court will direct entry of summary judgment on all the plaintiff's claims in favor of Defendant Hess & Clark as there is no genuine issue as to any material fact precluding judgment and dismissal of the complaint.

IT IS SO ORDERED.